COMMONWEALTH vs. DELMER T. AMAZEEN.

Berkshire. October 3 1977. — April 20, 1978.

Present: HENNESSEY, C.J. QUIRICO, KAPLAN, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver. Practice, Criminal*, Directed verdict, Charge to jury, Empanelling of jury. *Jury and Jurors. Evidence*, Photograph, Judicial discretion, Admissions and confessions.

There is no requirement that police officers must advise an individual that he is charged with a crime or that he is a suspect before a valid waiver of Miranda rights may be obtained. [76-78]

Evidence presented at a hearing on the defendant's motion to suppress inculpatory statements amply supported the finding that the defendant had made a valid waiver of his Miranda rights. [78-79]

Evidence at a murder trial was sufficient to establish malice and warranted the judge's denial of the defendant's motions for a directed verdict of not guilty on so much of the indictment as charged murder in the first degree and murder in the second degree. [79-81]

A defendant was not entitled to have instructions given to the jury in the precise terms which he requested where the judge instructed the jury as to the substance of the defendant's request. [81-82]

At a murder trial, the judge's instruction, in response to a jury question, that "panic" could be considered in connection with manslaughter but that neither side had the burden of establishing the existence of panic did not, in the context of his entire charge, constitute reversible error. [82]

A judge who had earlier given thorough instructions concerning murder in the first and second degree as well as manslaughter was not required to repeat the instructions on manslaughter when asked by the jury to explain what constitutes murder in the first and second degree. [82]

There was no merit to the defendant's argument that the exclusion from the jury of a prospective juror because of his prior criminal record denied the defendant his right to a jury composed of a cross section of the community. [82-83]

A judge did not abuse his discretion in refusing to excuse for cause a juror who was acquainted with the prosecutor, nor was the defendant harmed by the refusal where he peremptorily challenged the juror and did not exhaust all his peremptory challenges in the jury selection process. [83-84]

At a murder trial, there was no error in the admission of photographs of the victim's body. [84]

At a murder trial, no error was shown by the fact that a State police officer was permitted to read to the jury the defendant's written statement after it had been introduced in evidence. [84]

INDICTMENT found and returned in the Superior Court on October 9, 1974.

Pretrial motions to suppress evidence were heard by *Tamburello*, J., and the case was tried before him.

*Thomas J. O'Connor* for the defendant.

*John C. Bryson Jr.*, Special Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Pursuant to G. L. c. 278, §§ 33A-33G, the defendant, Delmer T. Amazeen, appeals his conviction of murder in the second degree on an indictment which charged murder in the first degree. Amazeen argues assignments of error concerning (1) the denial of a pre-trial motion to suppress inculpatory statements made by him; (2) the denial of his motions for a directed verdict of not guilty; (3) the judge's instructions to the jury; (4) the selection of the jurors; (5) the admission of color photographs of the deceased; and (6) the reading of his written statement to the jury.[1] We conclude that the conviction should be affirmed and that we should not exercise our power under § 33E in favor of the defendant.

We summarize the evidence presented at the trial, which included two incriminating statements made by the defendant. Julia C. Schroeter (Schroeter), the sister of Amazeen's wife,[2] and the defendant apparently had a romantic involvement for a number of years. On Sunday, April 14, 1974, the defendant and Schroeter went together to a drive-in theatre. While they were in the defendant's station wagon

---

[1] Assignments of error not briefed are deemed waived. *Stranad* v. *Commonwealth*, 366 Mass. 847, 848 (1974). *Commonwealth* v. *Kleciak*, 350 Mass. 679, 681 (1966).

[2] There was evidence that Schroeter and Amazeen's wife had not spoken to each other for a period of two years.

at the theatre, the defendant hit Schroeter at least three times with a hammer. The defendant then drove a few miles away and stopped to transfer the victim to the rear seat. As he opened the door, the victim fell out onto the road. The defendant stated that he then decided to pull the station wagon up so that he could put the victim in the back of it. As he moved the car forward, he drove over the victim's body with the rear wheel. He then backed the car over the victim again. The defendant next attempted to throw the body into the woods along the road; however, he was unable to do so because of the presence of a barbed wire fence. He then brought the body to a vacant cottage near his home and left it there overnight. The next morning the defendant disposed of the body in a secluded spot in a forest.

Schroeter's son and his fiancée returned to Schroeter's house on the evening of April 14 and found no one home. Schroeter's son attempted to contact his mother by telephone on April 15 and April 16. As a result of his inability to reach her, he called his uncle, Amazeen, to determine if he knew the whereabouts of Schroeter. Amazeen said he had seen Schroeter on Sunday but that she was not with him at present. Approximately forty-five minutes later, Schroeter's son called again and asked if Amazeen knew "where she might have been, who she might have gone with . . . ." Amazeen said "he didn't know or she didn't tell him where she was going." Schroeter's disappearance was reported to the local and State police. A State police officer went with Schroeter's son to Amazeen's home on the evening of April 16. Amazeen told the officer that he had visited Schroeter on Sunday and that Schroeter was at her home at the time he left there.

The body of Schroeter was found on April 18. An autopsy was performed that evening. The autopsy report indicated that Schroeter "came to her death as a result of multiple blows to the body, crushed chest."

Amazeen did not work on Monday, April 15. He worked a full day on Tuesday and Wednesday. On Thursday he .

worked half a day and after receiving his pay check he left. Amazeen's wife found a note on her return home on April 18. In the note, Amazeen said, "I have to go away for a while to see if I can earn more money to pay my bills. If my checks come before I come back sign my name and then yours. They are both yours. I will write or call you. Del."

On April 20, the State police learned that Amazeen's car had been seen at his sister's house in Bradford, Massachusetts. Four State police officers went to Amazeen's sister's house. In Bradford the defendant made an incriminating oral statement; later at one of the State police barracks, the defendant dictated another statement. The defendant moved to suppress both these statements. After a hearing, the trial judge denied this motion.

1. *Motion to Suppress the Defendant's Statements.*

We summarize the judge's findings. On April 20, 1974, four State police officers arrived at the home of the defendant's sister and asked for the defendant. The police officers identified themselves to the defendant and his sister. The defendant and the officers then proceeded to the driveway in front of the house. One of the officers asked the defendant if he could read and then gave him a card containing the Miranda warnings. The officer asked the defendant if he understood the card, and he replied that he did. The officer then read each of his rights to the defendant and asked him whether he understood each of them. The defendant again answered that he did understand. The police officer then asked the defendant if he wanted to talk to the officer, and the defendant replied that he did. Before the defendant made his oral statement, the police officer had also commented that he guessed the defendant knew the reason for the police visit; the defendant stated that he did. The defendant then made an incriminating statement to the police.

The police next took the defendant to a police barracks. In the yard of the barracks, one of the officers informed him that he was under arrest for the murder of Schroeter. At the barracks, he was advised of his right to use the telephone,

and he signed a waiver of that right. An officer again went over the defendant's Miranda rights with him. Then the officer read the Massachusetts State police interrogation form, which also contained Miranda warnings, to the defendant. The defendant replied that he understood each of his rights and that he would answer questions without the presence of an attorney. The defendant signed the interrogation form. He then dictated a statement to the officer which was typed as it was dictated. Amazeen signed this statement.

The judge found that complete Miranda warnings were given in the driveway and again at the barracks and that, in response to questions whether he understood his rights, the defendant replied each time that he did understand them. The judge also found that the defendant appeared to be intelligent, well spoken, and cooperative; his conduct with the police made it strongly appear to the judge that the defendant was aware at all times of what was going on. The judge concluded that the defendant made a voluntary, knowing, and intelligent waiver of his rights.[3]

---

[3] A judge's subsidiary findings will not be disturbed if they are warranted by the evidence. *Commonwealth* v. *Murphy* 362 Mass. 542, 547 (1972). However "[o]ur appellate function requires that we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.'" *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977).

The judge's conclusions are as follows:

"A. The defendant appears to have abandoned the grounds set forth in his affidavit for suppression of the statements, namely, that he was tired, sleepy and groggy and did not understand his rights. There was no credible or substantial evidence given to this effect. Instead the defendant has proceeded on the basis that no warnings were given and that, if they were given, they were not understood, and his rights were not waived by him. Because of the gravity of the indictment the Court will deal with the motion as though the latter grounds had been set forth in the affidavit.

"B. I find there is no merit to the motion to suppress the statements as presented. The defendant was given complete Miranda warnings by Sgt. Clemens in the driveway at the sister's home in Bradford, again given the warnings at the Topsfield State Police Barracks, and again at the House of Correction in Pittsfield. The statements on the Miranda card were read by the police to the defendant, and in turn the defendant was given the card to read for himself. The police in this case proceeded commendably in repeating the warnings as the investigation continued, and also spelled out

The defendant contends in this court that his first statement should have been suppressed because he could not knowingly waive his rights unless he was informed that he was charged with a crime or that he was a suspect. *Miranda* does not require the police to provide a defendant with such information. See *Miranda* v. *Arizona,* 384 U.S. 436, 467-473 (1966); *Commonwealth* v. *Lewis,* 374 Mass. 203 (1978). And we decline to impose an additional requirement that police officers must advise a defendant that he is charged with a crime or that he is suspect before a valid waiver may be obtained. See *Commonwealth* v. *Borodine,* 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049 (1977). See also *Commonwealth* v. *Lewis, supra.*

The evidence presented at the suppression hearing amply supported the judge's findings and his ruling that the defendant had made a valid waiver of the rights protected by *Miranda.*[4] To the extend that the defendant's argument on this issue is directed to trickery or deception on the part of the police, it is also without merit. Although Amazeen was not explicitly informed that he was to be charged with

the warnings, sentence by sentence, and the defendant was asked each time if he understood the warnings and he replied each time that he did understand them.

"C. The defendant appeared to be a rather intelligent person, well spoken, willing to cooperate, and his conduct not only in talks with the police, but in taking them over the country roads that night makes it strongly appear to the Court that the defendant was aware at all times of what was going on. Another indication of his understanding of the warnings was when he declined to show the police the next morning where he had left the body.

"D. I find that the defendant was given the Miranda warnings, that he was fully advised of his rights. I find that the waiver made by the defendant of his rights to remain silent, to counsel, and his other rights, was made voluntarily, knowingly and intelligently. I find that the defendant had the rational intellect to understand his rights, and to give the statement which was later signed by him. I find that the Commonwealth has sustained its burden of proof."

[4] There was evidence that the defendant was fifty years old at the time of his arrest. He had completed three years of trade school in addition to nine years of academic schooling. He had also taught history and civics as a scoutmaster.

murder before he made his first statement, the officer who gave the Miranda warnings had commented to the defendant that the defendant probably knew why the police were there, and the defendant replied that he did. The defendant's own testimony indicates that after being warned in accordance with *Miranda* he "remembered" telling the officer that he understood his rights and "wanted to tell . . . [the officer] what happened in Becket with Julia Schroeter." No argument has been made by the defendant that he would not have made his first statement if he had been told that he was charged with murder or that he was a murder suspect. Indeed, in view of the absence of such a claim in the defendant's own testimony, such an argument would not be supported by the transcript. The transcript is devoid of any evidence to support a contention of unfairness, deception, or trickery on the part of the police toward this defendant. There was no error in the denial of the defendant's motion to suppress this statement.

The defendant also argues that his written statement should have been suppressed because this statement was the product of his impression that the cat was already out of the bag. See *Commonwealth* v. *Haas*, 373 Mass. 545, 554 (1977); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 686-687 (1975), cert. denied, 425 U.S. 959 (1976). However, for a subsequent statement to be excluded on this ground, the prior statement must have been one requiring exclusion. See *Commonwealth* v. *Mahnke, supra.* Since we have concluded that the defendant's first statement was properly admitted, his argument for excluding his second statement falls.

2. *Denial of Motions for a Directed Verdict.*

At the close of the Commonwealth's case; and again after the defense rested, the defendant moved for a directed verdict of not guilty on so much of the indictment as charged murder in the first degree and murder in the second degree. The motion was denied.

The defendant thus raised the issue whether there was sufficient evidence to warrant submission of the murder charges to the jury. See *Commonwealth* v. *Kelley*, 370

Mass. 147, 150 (1976); *Commonwealth* v. *Caine*, 366 Mass. 366, 372-374 (1974). In considering this issue we review only the evidence introduced up to the time that the Commonwealth rested its case. *Commonwealth* v. *Kelley, supra* at 150.[5]

Murder is the unlawful killing of a human being with malice aforethought. *Commonwealth* v. *Caine, supra* at 373. Malice includes any intent to inflict injury without legal excuse or palliation. *Commonwealth* v. *Mangum*, 357 Mass. 76, 85 (1970). The defendant argues that there was insufficient evidence to establish malice. The thrust of the defendant's argument is that the crushed chest which resulted from the victim's being run over by the car was the cause of death and that there was no evidence that the defendant intentionally ran over the victim.

The record reveals that there was some conflict in the expert testimony concerning the contribution of the hammer blows to the victim's death. However, even if the crushed chest caused by the car were the sole cause of death, sufficient evidence exists from which the jury could have in-

---

[5] The Commonwealth's position as to proof did not deteriorate between the time the Commonwealth rested and the close of all the evidence. See *Commonwealth* v. *Kelley*, 370 Mass 147, 150 n.1 (1976). The defendant argues in connection with the issue of intent that his statements and his testimony, in which he denied that he intentionally ran over the victim, indicate a lack of intent. He contends that because part of his account was apparently believed by the jury, the rest of his statements must also be taken as true. He therefore maintains that there was uncontradicted evidence that the running over of the victim was accidental. The jury, however, are not required to accept or reject the statements of the defendant in their entirety; rather, the jury may believe such portions of the defendant's statements as they may consider trustworthy. *Commonwealth* v. *McInerney*, 373 Mass. 136, 141-144 (1977). *Commonwealth* v. *Goldenberg* 315 Mass. 26, 30 (1943). Moreover, the defendant's testimony provided additional evidence from which the jury could have reached a verdict of murder in the first degree or murder in the second degree: the defendant, after stopping his car, waited for another car to go by before he attempted to remove the victim from the car; he knew that the victim was alive when he ran over her the second time; and his descriptions of how the victim came to be under the wheels of the car and how the victim's clothes came off could be viewed as improbable or implausible by the jury.

ferred malice. In particular, the fact that the defendant backed the car over the victim after he had run over her once could have been found by the jury to evidence intent. Moreover, from the testimony concerning the hammer blows, the condition of the body, the disposal of the evidence, Amazeen's leaving the area shortly after Schroeter's death, and his lying to his nephew and the police, the jury could also have inferred intent. The fact that in his statement the defendant did not admit that he intentionally ran over the victim does not mean that the jury cannot infer his intent from his actions in the light of all the surrounding circumstances. To the extent that his words and his conduct permit conflicting inferences, it is for the jury to determine where the truth lies. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 355-356 (1957).

The judge was correct in deciding that he could not rule as matter of law that the defendant lacked the requisite intent.[6]

3. *Jury Instructions.*

The defendant first contends that it was error not to instruct the jury that if the defendant drove the car over the victim without intent, then the defendant could not be found guilty of murder. The judge, however, conveyed the substance of what the defendant now argues should have been told to the jury when he instructed the jury that they could not combine intended and unintended actions to reach a verdict. The defendant is not entitled to have

---

[6] The defendant also contends that there was no evidence to warrant the judge in submitting the issue of murder in the first degree to the jury. Since the defendant was acquitted of murder in the first degree, he must demonstrate prejudice on the record in order to urge such a contention. The record here does not disclose any prejudice to the defendant from the submission of the first degree issues to the jury. Moreover our review of the entire record under § 33E leads us to conclude that, in any event, the judge was correct in submitting the facts to the jury on the issue of "deliberate premeditation" (see *Commonwealth* v. *Caine,* 366 Mass. 366, 374 [1974]), as well as on the issue of extreme atrocity or cruelty (see *Commonwealth* v. *Connolly,* 356 Mass. 617, 628, cert. denied, 400 U.S. 843 [1970]).

instructions given to the jury in the precise terms which he has requested. *Commonwealth v. Kelley*, 359 Mass. 77, 92 (1971).

The defendant next contends that the judge's discussion of "panic" in response to a jury question was confusing and prejudicial. The judge basically instructed the jury that panic could be considered in connection with manslaughter but that neither side had the burden of establishing the existence of panic.[7] Although the judge's comments were not so clear as they could have been, these comments, when read in the context of the charge as a whole, do not constitute reversible error particularly since the judge had earlier thoroughly explained to the jury all the options available to them in reaching their verdict. See *Commonwealth v. Gagne*, 367 Mass. 519, 525-526 (1975).

The jury requested the judge to explain what constitutes murder in the first and second degree. The judge then reinstructed the jury on these issues. The defendant argues that it was error for the judge not to repeat the instructions on manslaughter when he repeated the charge on murder in response to this question. We disagree. The judge had earlier given thorough instructions concerning murder in the first and second degree as well as manslaughter. A judge in responding to a question from the jury need not go beyond the scope of the jury's question and instruct on other matters. See *Commonwealth v. Sires*, 370 Mass. 541, 547 (1976).

4. *Selection of the Jury.*

One prospective juror was excused for cause because he had been sentenced to six months in a house of correction eleven years earlier. The defendant argues that excusing this juror denied him the right to a jury composed of a cross section of the community.

---

[7] The judge had clearly instructed the jury that the Commonwealth had the burden of proof on every essential element of the three possible verdicts of guilt.

This argument is without merit. "[I]t can hardly be said that persons . . . with records of conviction must be seated in a capital case, subject only to challenge on voir dire, in order to provide a panel which is 'truly representative of the community.'" *Commonwealth* v. *Martin,* 357 Mass. 190, 192 (1970).

One prospective juror knew the prosecutor. He was a member of the same church parish as the prosecutor and was a couple of years behind the prosecutor in high school.[8] The defendant maintains that it was error not to excuse this juror for cause because he was not "indifferent." See G. L. c. 234, § 28. We disagree.

A large degree of discretion is allowed the judge in the jury selection process. *Commonwealth* v. *Dickerson,* 372 Mass. 783, 794 (1977). "In the absence of action or inaction which constitutes a denial of constitutional rights . . . or which constitutes an error of law, such as an abuse of discretion, we will not interfere with the trial judge in the jury selection process." *Commonwealth* v. *McKay,* 363 Mass. 220, 223 (1973). In the present case, the judge, after becoming aware of the prospective juror's connections with the prosecutor, continued to question him to determine whether these connections would affect his impartiality. The prospective juror responded that they would not. The judge then found that the juror stood indifferent. Where, as here, the judge, who had the opportunity to observe the prospective juror, makes a determination that the juror is indifferent after exploring the grounds for a possible claim that the juror was not impartial, we cannot conclude, in the absence of any affirmative evidence to the contrary, that the judge abused his discretion.

Even assuming arguendo that the judge erred in refusing to excuse this juror for cause, the error would be harmless beyond a reasonable doubt. Since the defendant peremptorily challenged this prospective juror and since he did not

---

[8] The juror, however, had no social or business relationship with the prosecutor.

exhaust all his peremptory challenges in the jury selection process, the defendant was not harmed by the failure to excuse this juror for cause. *Commonwealth* v. *Tropeano,* 364 Mass. 566, 567-568 (1974). See *Commonwealth* v. *Nassar,* 351 Mass. 37, 40-41 (1966).

5. *Admission of Color Photographs.*

The admission of photographs is within the sound discretion of the judge. *Commonwealth* v. *Bys,* 370 Mass. 350, 360-361 (1976). "Only where a question ordinarily discretionary is so clear that discretion is superseded by imperative legal duty can the result be revised." *Bartley* v. *Phillips,* 317 Mass. 35, 44 (1944). See *Commonwealth* v. *Richmond,* 371 Mass. 563, 564-566 (1976). Tested by this standard there is no error.

6. *Reading of the Defendant's Statement to the Jury.*

The defendant made a written statement after he was taken into custody. At the trial this statement was introduced in evidence. A State police officer also read this statement to the jury. The defendant argues that the reading of the statement was error because (1) the statement speaks for itself and was available to jurors during the trial and during their deliberations and (2) the judge could not control the emphasis placed on parts of the statement or the inflection of the officer's voice.

The judge has broad discretion in determining the method by which evidence is brought to the jury's attention. The burden of showing an abuse of the judge's discretion falls squarely on the person alleging error. No error is shown.[9]

---

[9] The defendant's brief on this issue repeats the assertions made to the judge without citation of authority or reasoned argument. This is insufficient for compliance with our appellate practice. Cf. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). The transcript indicates that after the statement was read the defendant did not bring any claim of unfairness to the judge's attention. Further, there was no request for an appropriate instruction to correct any impression of undue emphasis or unfair inflection. "The right of appellate review cannot compel this court to engage in an intellectual exercise in the abstract." *Commonwealth* v. *Hall,* 369 Mass. 715, 725 (1976).

7. *General Laws c. 278, § 33E.*
Pursuant to G. L. c. 278, § 33E, we have reviewed the entire case for consideration of the law and the evidence. We find no reason to order a new trial or to direct a verdict of a lesser degree of guilt.

*Judgment affirmed.*