COMMONWEALTH vs. JOHN A. WILBORNE.

Essex.   September 9, 1980. — January 7, 1981.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Directed verdict, Instructions to jury,
  Note-taking by jurors, Empanelling of jury. *Evidence,* Polygraphic
  test. *Witness,* Cross-examination, Privilege, Polygraphic test. *Con-
  stitutional Law,* Waiver of constitutional rights, Admissions and con-
  fessions. *Waiver. Jury and Jurors.*

At a murder trial, evidence that the defendant would not permit the vic-
  tim's wife to call an ambulance although the victim lay wounded and
  gasping for breath for at least fifteen to twenty minutes after he was
  stabbed, as well as evidence as to the nature of the injuries inflicted
  and the type of weapon used, was sufficient to warrant a finding that
  the homicide was committed with deliberate premeditation. [244-245]
At a murder trial, the judge did not err in declining to charge on man-
  slaughter where there was no evidence which would warrant an in-
  ference that the stabbing of the victim was unintentional or the conse-
  quence of wanton or reckless conduct in the course of an affray.
  [245-246]
The judge at a criminal trial did not err in excluding evidence concerning
  the contents and results of a polygraph test administered to a prosecu-
  tion witness where the defendant failed to lay a proper foundation as
  to the examiner's qualifications to administer the test and to form an
  opinion concerning the interpretation of the results. [246-249]
Evidence in connection with a defendant's motion to suppress a statement
  made to the police warranted the judge's findings that neither the de-
  fendant's relatively young age nor the fact that he had been ad-
  ministered drugs as treatment for an injured hand approximately two
  and one-half hours before the statement was taken precluded a valid
  waiver of the defendant's Miranda rights and that the statement was
  voluntarily made after a knowing and intelligent waiver of the defend-
  ant's constitutional rights. [249-252]
The judge at a criminal trial did not abuse his discretion in permitting the
  jurors to take notes during the trial. [253]
In a proceeding on a motion for a new trial of a criminal case based on an
  allegation that one of the jurors was extremely hard of hearing, the

judge was warranted in concluding that the allegation, made by an al-
ternate juror, was the result of a misunderstanding and that no juror
had a hearing impairment sufficient to warrant a new trial. [253-254]
The judge at a criminal trial did not abuse his discretion in failing to ex-
cuse for cause four of the jurors where the judge questioned each of the
jurors extensively on the grounds for bias asserted by the defendant
and allowed counsel to ask questions of the jurors. [254]

INDICTMENTS found and returned in the Superior Court
on January 18, 1977.

The cases were tried before *McNaught*, J.

*Elliot M. Weinstein* for the defendant.

*Lila Heideman*, Assistant District Attorney, for the Com-
monwealth.

ABRAMS, J. Convicted of murder in the first degree of
William Sanders, John A. Wilborne appeals to this court
pursuant to G. L. c. 278, §§ 33A-33H.[1] Wilborne argues
error concerning (1) the denial of his motion for a directed
verdict on the indictment for murder in the first degree;
(2) the failure of the judge to instruct the jury on man-
slaughter; (3) the restriction of the cross-examination of a
Commonwealth witness; (4) the denial of his motion to sup-
press a statement made to police; and (5) three rulings made
by the judge concerning the conduct of the trial. Wilborne
also claims that we should exercise our power under G. L.
c. 278, § 33E, and reduce the verdict to a lesser degree of
guilt. We affirm the convictions and conclude that there is
no reason to exercise our power under G. L. c. 278, § 33E,
to order a new trial or to direct the entry of a verdict of a
lesser degree of guilt.

We summarize the facts. In the early morning hours of
October 4, 1976, the wife of William Sanders was awak-

---

[1] Wilborne was also convicted for the rape and kidnapping of Sanders's
wife. He was sentenced to a life term to be served at the Massachusetts
Correctional Institution at Walpole, for the conviction of murder in the
first degree. Concurrent terms of fifteen to twenty years for the convic-
tion of rape, and eight to ten years for the conviction of kidnapping, were
also imposed. On appeal, he does not argue any error with respect to the
convictions of rape and kidnapping.

ened by a loud noise and gasping sounds. She ran across the hall, where she found her husband lying in the doorway of the back bedroom, and the defendant bending over him, pulling a large knife from her husband's body.

Sanders's wife testified that the defendant, still carrying the knife, took her to the bathroom where he rinsed his right hand and wrapped it in a towel. At that time she observed deep cuts on the defendant's right hand. Sanders could be heard gasping for breath. Sanders's wife asked Wilborne to let her call an ambulance and he refused. Wilborne then took Sanders's wife to her bedroom and proceeded to assault her sexually throughout the remainder of the night. The next morning the defendant forced her to pack some things, load her car, and take him to a bank to get money deposited there by Sanders and his wife.

At the bank, the witness walked directly to a friend who was employed there and told her to call the police, saying, "This man murdered my husband." The defendant fled from the bank. Later he was found by the police hiding behind a fence in a nearby backyard. After Wilborne was arrested and booked, the officers took him to a hospital for treatment of his cut hand.

Investigating officers found Sanders's body stretched across the threshold of the back bedroom in a pool of blood. He was wearing pajamas and clutching a sheet and a blanket. He had a two-inch wound in his throat. Blood was found in the hallway, back bedroom, and bathroom. Bloodied towels were found in the bathroom and front bedroom, and a small amount of blood was found in one corner of a sheet from the wife's bed. The back bedroom was in a state of disarray; a small bed was on top of a larger bed, and a portion of the wall next to the door was caved in. In the study adjacent to the back bedroom, officers found a bloody knife with an eleven-inch blade and a five-inch wooden handle lying on top of some books. The cause of death was a stab wound of the neck, which resulted in a perforation of the subclavian artery and a lung. Other facts will be related as necessary to address the issues raised in this appeal.

1. *The motion for directed verdict.* At the close of the Commonwealth's case, the defendant asked the judge to direct a verdict of acquittal on the indictment alleging murder in the first degree, on the ground that there was insufficient evidence to permit the jury to infer deliberate premeditation.[2] *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). "In reviewing the denial of a motion for directed verdict, we consider only the evidence introduced up to the time the Commonwealth rested its case." *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979). *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976). "[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). See *Commonwealth* v. *Appleby*, 380 Mass. 296, 311 (1980).

The defendant asserts that the evidence equally supports the theory that Sanders's wife killed him or that Sanders himself introduced the knife into the affray and was subsequently killed in the fight. Since the evidence equally supports these inconsistent propositions, the defendant argues, none is established by legitimate proof. See *Commonwealth* v. *Croft*, 345 Mass. 143, 145 (1962). See also *Commonwealth* v. *Rhoades*, 379 Mass. 810, 817 (1980). The defendant reaches this conclusion by claiming that the only evidence which should be considered is evidence as to what occurred prior to the stabbing. He asserts that there is no evidence on what occurred prior to the stabbing which

---

[2] Trial counsel also argued that if he were correct, the judge would have to order a directed verdict of acquittal on the charge of murder in the second degree since the Commonwealth, by claiming that the crime was committed with deliberately premeditated malice, had made a binding election that it would prove murder in the first degree and nothing less. The defendant does not argue the theory of binding election on appeal. G. L. c. 265, § 1. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 795-798 (1977). See also *id.* at 798-812 (Quirico, J., concurring).

would warrant the jury in finding that the homicide was committed with deliberately premeditated malice. We do not agree.

In this case, in addition to the nature of the injuries and the type of weapon used, there was evidence that the defendant would not let Sanders's wife call an ambulance although Sanders lay wounded and gasping for breath for at least fifteen to twenty minutes after the wound was inflicted. That evidence, if believed, is sufficient for the jury to infer "a conscious and fixed purpose to kill continuing for a length of time." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356 (1957).

Although the defendant by his cross-examination tried to suggest to the jury that Sanders's wife committed the homicide, the evidence supports the jury's conclusion that Wilborne was the person responsible for Sanders's death. To the extent that conflicting inferences are possible from the evidence, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978). There was no error in denying the defendant's motion for a directed verdict.

2. *Manslaughter instruction.* The defendant asserts that the judge's failure to instruct the jury on manslaughter is reversible error.[3] The defendant argues that the jury could have found that he killed the victim upon sudden combat without malice[4] or that the stabbing was a consequence of wanton or reckless conduct in the course of an affray.[5] In

---

[3] At trial, the defendant claimed that, if the judge charged the jury on murder in the second degree, he must also charge on manslaughter. He does not argue this theory on appeal.

[4] Voluntary manslaughter is a "killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931).

[5] "Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975), and cases cited.

support of his argument, he suggests that we consider the following bits of evidence: the disarray found in that part of the apartment he shared with Sanders,[6] the loud noise heard by Sanders's wife, and the defendant's wounded hand. There was no error.

A manslaughter instruction would have allowed the jury to speculate not only as to whether the defendant was reasonably roused to the heat of passion, but also as to whether a struggle in fact occurred. "In the absence of any evidence as to the circumstances of the struggle, no reasonable doubt was raised as to whether the defendant reacted on reasonable provocation. The jury could not be permitted merely to speculate on whether the defendant in the course of the struggle might have been roused to the heat of passion." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980).

The defendant suggests that since the knife was not plunged to its full length into Sanders's body, an involuntary manslaughter charge should have been given. The short answer to this contention is that there is no evidence in the record which would warrant a jury in drawing an inference that the stabbing was unintentional or the consequence of wanton or reckless conduct in the course of an affray. We conclude that the judge correctly declined to charge on manslaughter.

3. *Restriction of cross-examination of a witness.* In response to the defendant's motion to be furnished with evidence favorable to the accused, the Commonwealth answered that Sanders's wife had taken a polygraph test administered to her by her then counsel.[7] The answer stated, "The Commonwealth knows said Mrs. Sanders failed said examination but knows nothing of the substance of said examinations [*sic*] questions." There is nothing in the record to indicate that defense counsel made any effort to obtain

---

[6] The record is not clear as to how much of the disarray was attributable to the events of October 4, 1976.

[7] The record does not disclose who administered the test, the lawyer for Sanders's wife, or an expert hired by her lawyer.

the questions or talk with the polygraph examiner prior to the trial.

At trial, defense counsel cross-examined Mrs. Sanders extensively as to the details of her testimony, her relationship with her husband, and her concern over his relationship with the defendant. He vigorously cross-examined her as to inconsistencies between her trial testimony, her statements to the police, and her testimony at the probable cause hearing. Defense counsel also established that the witness had hired a lawyer specializing in criminal law at the time she was being questioned by the police. When asked, "Did you take a certain sort of scientific test with regard to this case," her answer, "Yes," was admitted over objection. Defense counsel then asked, "And was that by reason of your consultation with your attorney? Just yes or no."

At that point, the judge interrupted, instructing Mrs. Sanders that she did not have to answer if she did not wish to: "That would fall within the attorney-client privilege. You do not have to answer that question if you choose not to do so." Mrs. Sanders chose not to answer. Defense counsel asked if she were willing to waive the privilege, "so that [he might] see the questions that were asked and the answers that you gave at that test?" The government objected, and the jury was removed following a bench conference which was not recorded.

The judge then instructed the witness as follows: "The attorney-client privilege applies to any communication that you had with [your attorney]. Anything that was done as a result of advice received from [your attorney] I am willing to consider as part of that attorney-client privilege. [Defense counsel] has the right to ask you before the jury, 'Are you willing to waive that attorney-client privilege?' There is no duty upon you at all to waive that attorney-client privilege." The defendant took exception to the instructions as to the scope of the attorney-client privilege. After recess, the defendant again asked if the witness were willing to waive the attorney-client privilege. She answered that she was not. The objection to defense counsel's

next question, "What kind of a test was it that you took," was sustained. An offer of proof was made that the answer would be "polygraph test" or "lie detector test," and an exception was taken to the judge's ruling. Cross-examination then continued.

The defendant later requested that the jury be charged that the fact that the witness invoked the attorney-client privilege might be considered in evaluating her testimony. That request was denied, and the defendant took exception, emphasizing that this case was similar to *Davis* v. *Alaska,* 415 U.S. 308 (1974), in that the defendant was seeking to explore the witness's motive for testifying and her credibility. On appeal, the defendant claims that it was error to exclude testimony from the witness as to the results and contents of the polygraph test. The defendant claims that the attorney-client privilege must yield to a defendant's constitutional right to confrontation. Hence he asserts that it was error to exclude questions concerning the witness's polygraph test. See *Davis* v. *Alaska, supra; Chambers* v. *Mississippi,* 410 U.S. 284 (1973); *Commonwealth* v. *Bohannon,* 376 Mass. 90 (1978); *Commonwealth* v. *Ferrara,* 368 Mass. 182 (1975); *Commonwealth* v. *Michel,* 367 Mass. 454 (1975). We disagree.

The cases cited by the defendant all involved the exclusion of trustworthy evidence. The record before us is barren of any showing that the excluded evidence was circumstantially trustworthy or bore "considerable assurance of . . . reliability." *Chambers* v. *Mississippi, supra* at 300. Thus the judge should have sustained the Commonwealth's objection without reaching the issue of attorney-client privilege. We intimate no view as to the correctness of the judge's ruling on the attorney-client privilege.

We never have held the results of a witness's polygraph examination to be admissible in evidence. We do not intimate any view that such evidence is generally admissible. Assuming, arguendo, that in some limited circumstances evidence of a witness's polygraph examination might be admissible, those circumstances are not present in this case.

The defendant failed to lay a proper foundation as to the examiner's qualifications to administer the test and to form an opinion as to the interpretation of the results. The effectiveness of the results of a polygraph test is "almost totally dependent upon the skill of the polygraphist," *Commonwealth* v. *Vitello*, 376 Mass. 426, 439 (1978), quoting Abrams, Polygraphy Today, 3 Nat'l J. Crim. Def. 85, 105 (1977). A lay witness is not competent to testify to the polygraph test results or the details of the examination. Expert testimony from the examiner always is necessary to support the admission of polygraph evidence. *Commonwealth* v. *Vitello, supra* at 434-442. *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 427 (1974). In view of the barrenness of the present record, we also think it "the part of wisdom to reserve again the question whether evidence of a polygraph test is ever admissible to impeach a prosecution witness." *Commonwealth* v. *Moore*, 379 Mass. 106, 114 (1979).

4. *Admissibility of the defendant's statement to the police.* Two days after the Sanders murder, the defendant was released from the hospital where he had been undergoing treatment for his cut hand. He was taken to the police station where he gave a statement to police.[8] At trial, the defendant moved to suppress[9] that statement on the grounds that at that time he could not make a knowing and intelligent waiver of his rights and that the effect of his illness and the conduct of the police rendered his statement inadmissible.

We summarize the findings of the judge. The defendant was admitted to Lynn Hospital for treatment of his cut hand at 11:50 A.M. on October 4, 1976. At 7:40 A.M., on October 6, 1976, Wilborne was given an injection of fifty milligrams of Demerol. At approximately 9:45 A.M. on October 6, he was discharged from the hospital and two Lynn police officers took him from the hospital to the Lynn police

---

[8] A statement made to police by the defendant on October 4, 1976, was suppressed because the Commonwealth failed to disclose the statement pursuant to a pretrial order.

[9] The record does not indicate that a written motion to suppress the statement was filed before trial. See Rule 9 of the Superior Court (1974).

station. At the station, Wilborne was interrogated by a lieutenant of the State police and two Lynn officers, and, at approximately 10:15 A.M., he made a statement.

The judge found that the 7:40 A.M. injection was the only Demerol the defendant received that day and that he was apparently in control of his senses at the time of the interrogation and statement. At the time of the interrogation, Wilborne was seventeen years old. The defendant's school records showed him to be of at least normal intelligence. The judge found that the police informed Wilborne of the rights protected by *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966), and of his right to make a telephone call; and that Wilborne understood those rights at that time, and that he voluntarily and knowingly waived them.

Taking into account the condition of the defendant's injured hand, the fact that Demerol had been given two and one-half hours before the statement was taken,[10] the absence of complaints by the defendant during the interrogation (according to the lieutenant's testimony), the absence of any evidence of unfair suggestion or threat made by any of the officers present, and the circumstances and physical surroundings at the interrogation, the judge found nothing "by way of force, fraud or compulsion or the drugs that were administered to him that was sufficient to override his intelligence, his volition, and his freedom of will."[11]

___

[10] At the defendant's request, the judge took judicial notice of the dosage and effects of Demerol as set forth in the 1976 Physician's Desk Reference. That reference book indicated that the usual dosage of Demerol is given at intervals of three to four hours if required. On appeal the defendant suggests in a footnote in his brief that expert testimony was required on the dosage and effects of Demerol. Since the defendant himself offered the Physician's Desk Reference, he cannot now complain of its use at trial.

[11] Before admitting the statement in evidence, the judge instructed the jury that before they could accept the statement or draw any inferences from it, they would have to find (1) that the statement actually was made; (2) that it was made by the defendant; (3) that it was made voluntarily; and (4) that it was the product of a rational intellect. To this end, the judge instructed, the jury was to consider the circumstances under which the statement was made, the persons who were present at the time,

In reviewing the admission of the defendant's statement, the judge's subsidiary findings are entitled to substantial deference. *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd 439 U.S. 280 (1978). Nevertheless, "[o]ur appellate function requires that we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found . . . .'" *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), quoting from *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977), quoting from the separate opinion of Justice Frankfurter in *Brown* v. *Allen*, 344 U.S. 443, 507 (1953). See *Commonwealth* v. *Murphy*, 362 Mass. 542, 551 (1972). We conclude that the record adequately supports the judge's subsidiary findings of fact and his conclusion that the statement was voluntarily made after a knowing and intelligent waiver of the constitutional rights protected by the *Miranda* decision.

The defendant asserts that his age and physical condition precluded a voluntary, knowing and intelligent waiver of his Miranda rights. The judge weighed both the defendant's age and his physical condition in reaching his conclusion. These factors do not automatically invalidate a

---

the place where the statement was made, and the evidence respecting the defendant's condition at the time the statement was allegedly made. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 432, 435 (1980). These instructions were reiterated when the defendant introduced a stipulation as to the facts to which another officer involved in the interrogation would have testified had he been available. The stipulation was that the officer had guarded the defendant at the hospital and had been present when he was transferred to police custody and questioned. It stipulated that he would testify that the defendant, at the time of the statement, appeared normal and in full control of his faculties. The defendant was informed of the Miranda warnings and was silent for a while. He said he was scared, and the officers talked with him for a while. The defendant then gave his statement. During the making of the statement, the defendant said he was nauseous and vomited. It was also stipulated that the officer would have testified that the waiver and statement were made voluntarily and no threats were made by anyone to the defendant. In support of the defendant's contention that he was too ill to make either a knowing and intelligent waiver or a voluntary statement, medical records regarding the defendant's cut hand were also introduced.

waiver. *Commonwealth* v. *Brady*, 380 Mass. 44, 49 (1980). *Commonwealth* v. *Hooks*, 375 Mass. 284, 289 (1978). Rather, the judge must look at the totality of circumstances, including the testimony concerning the conduct of the defendant, his physical and mental condition, his age, and the details of the interrogation. *United States* v. *Holmes*, 632 F.2d 167, 168-169 (1st Cir. 1980). *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 (1975). *Commonwealth* v. *Hooks, supra.*

On the issue of age, the judge found that the defendant, seventeen at the time, was advised of his rights and was given a chance to make a phone call or to request counsel. He found that the police officers did not make threats or unfair suggestions. The interrogation was brief; the statement was obtained in approximately one half an hour. The judge's findings indicate that he did not believe the defendant's claim that an officer raised his voice or lost his temper so as to frighten the defendant into waiving his rights.

The judge also considered the defendant's physical injury, and the fact that Wilborne had been given an injection of Demerol about two and one-half hours before making the statement. The judge concluded that Wilborne's ability to recall the detailed chronology of the events recited in the statement "belie[d] a person whose mind was befogged by any sort of drug."

The judge considered the totality of the circumstances, carefully weighed the conflicting evidence, and made findings. We will not lightly disturb a judge's determination which is supported by evidence in the record and which is also based on an assessment of the witnesses before him. See *United States* v. *Holmes*, 632 F.2d 167, 168-169 (1st Cir. 1980); *Commonwealth* v. *Hooks*, 375 Mass. 284, 289 (1978). There was no error in the denial of the defendant's motion.[12]

---

[12] On appeal, the defendant claims for the first time that his statement was inadmissible as a hearsay statement not within any recognized exception to the general rule excluding hearsay evidence. Assuming this issue is properly before us under G. L. c. 278, § 33E, there was no error. "The activities of the defendant on the day the murder was alleged to

5. *Miscellaneous rulings.* a. *Note-taking by the jurors.*
We find no abuse of discretion in the judge's decision to per-
mit the jurors to take notes during the trial. The trial was
lengthy, and it was within the discretion of the judge to
allow note-taking. *Commonwealth* v. *St. Germain,* 381
Mass. 256, 267 (1980). Rule 8A of the Superior Court
(1978). The judge instructed the jury that they were to take
notes sparingly and briefly and not to try to summarize all
of the evidence or let note-taking distract them from observ-
ing the demeanor of the witnesses. They were further in-
structed to use their notes only to refresh their memories,
not as authority to persuade fellow jurors. There was no
error.

The defendant complains that one Commonwealth wit-
ness, a police detective who had investigated the scene of
the crime, had already testified before the judge instructed
the jury that they would be allowed to take notes. The de-
fendant has not shown any unfairness arising from this fact.
We conclude that there was no error.

b. *Juror's possible hearing impairment.* After the trial
was completed, it came to the attention of the judge,
through an alternate juror, that one of the jurors might be
severely hard of hearing. During an extensive voir dire, all
the jurors, including the one whose hearing was in doubt,
were questioned, using a tape recorder, so that there would
be no chance of "lip-reading." The judge concluded that
the allegation was a result of a misunderstanding and that
no juror had a hearing impairment sufficient to warrant a
new trial. The question before the judge was a purely fac-
tual one, on which he heard the evidence and made a find-
ing. We accept that finding absent clear error. *Com-
monwealth* v. *Best,* 181 Mass. 545 (1902). We find no such

---

have been committed were material to the issue of his guilt. If, in de-
scribing them, it were found that he made wilfully false statements in
material particulars to the investigating authorities, consciousness of guilt
could be inferred." *Commonwealth* v. *Bonomi,* 335 Mass. 327, 348
(1957), and cases cited. See W.B. Leach and P.J. Liacos, Massachusetts
Evidence 209 (4th ed. 1967).

error, and we affirm the denial of the defendant's request for a new trial based on this ground.

c. *Composition of the jury.* During the jury selection, members of the venire were questioned individually concerning possible biases. The defendant used all of the seventeen challenges given him. He now asserts that the judge's failure to excuse four of the jurors for cause was an abuse of discretion.

The defendant asserts that two of the jurors, one a special police officer for a private corporation and the other a voluntary auxiliary defense police officer, should have been excused for cause. In each case, the court allowed counsel to question the potential juror concerning possible bias. Both men testified that their police associations would have no effect on their consideration of the evidence.

A third juror knew the victim of a rape. The juror stated that she did not think that her friend's experience would affect the juror's impartiality. A fourth juror had read about the case but said he would be able to decide the case based on evidence presented at trial. The defendant argues that the judge's failure to excuse these jurors for cause forced him to use peremptory challenges unnecessarily and resulted in two jurors deliberating on the case who were not impartial. We disagree.

The judge questioned each potential juror extensively on the grounds for bias asserted by the defendant and allowed counsel to ask questions of jurors. Although sixteen jurors were seated, the defendant was allowed seventeen (not sixteen) peremptory challenges. See G. L. c. 234, § 29. "Where, as here, the judge, who had an opportunity to observe the prospective juror, makes a determination that the juror is indifferent after exploring the grounds for a possible claim that the juror was not impartial, we cannot conclude in the absence of any affirmative evidence to the contrary, that the judge abused his discretion." *Commonwealth* v. *Amazeen,* 375 Mass. 73, 82-84 (1978).

6. *Review under G. L. c. 278, § 33E.* We have considered the whole case on the law and the evidence, and we conclude that the verdict of guilt on the charge of murder in the first degree was neither against the law nor the evidence. The interests of justice do not require either a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*