WILLIAM BROWN *vs.* COMMONWEALTH.

Suffolk. December 6, 1989. - March 20, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Evidence,* Consciousness of guilt, Admission by silence. *Practice, Criminal,* Required finding.

At a murder trial in which there was sufficient evidence for submission of the case to the jury on the issue of the defendant's guilt, and sufficient evidence to warrant a jury in finding the defendant guilty beyond a reasonable doubt, the defendant's motions for required findings of not guilty and for dismissal of the indictments after a mistrial were properly denied. [89-91]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 23, 1989.

The case was heard by *O'Connor,* J.

*Geoffrey C. Packard,* Committee for Public Counsel Services, for the plaintiff.

*Kathy Rabin,* Assistant District Attorney (*Audrey Parr,* Assistant District Attorney, with her) for the Commonwealth.

ABRAMS, J. William Brown was indicted in 1988 for the murder in the first degree of a twelve year old child in 1980 and for rape of a child by force. See G. L. c. 265, § 1; G. L. c. 265, § 22A. A jury trial commenced in the fall of 1988. Brown moved for required findings of not guilty at the conclusion of the Commonwealth's case. The judge denied Brown's motion. After three days of deliberation, the jurors informed the judge that they could not reach any verdicts. The judge declared a mistrial.[1] Thereafter, Brown filed a mo-

---

[1] The record before us does not disclose any objection by Brown to the judge's action.

tion to dismiss the indictments in the Superior Court because the Commonwealth's evidence of identification was insufficient as a matter of law. That motion was denied. Pursuant to G. L. c. 211, § 3 (1988 ed.), Brown sought the same relief from a single justice of this court. See *Aucella* v. *Commonwealth*, 406 Mass. 415, 416 (1990); *Neverson* v. *Commonwealth*, 406 Mass. 174, 174-176 (1989); *Berry* v. *Commonwealth*, 393 Mass. 793 (1985). After hearing, the single justice denied relief but allowed Brown's motion to stay the proceeding pending Brown's appeal to the full court. We affirm the single justice's denial of Brown's petition to dismiss the indictments. Trial of the cases is to proceed in the Superior Court.

In deciding whether the Commonwealth's evidence is sufficient, we apply the following standards. "[W]e consider only the evidence introduced up to the time that the Commonwealth rested its case and the defendant first filed his motions for directed verdicts." *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976). "[T]he defendant's rights became fixed at the time that the Commonwealth rested." *Id.* at 150 n.1.[2] "In reviewing the denial of motions for [required findings of not guilty] in criminal cases, we have frequently said that 'we must consider and determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged . . . .' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). See *Commonwealth* v. *Santos*, 402 Mass. 775, 785 (1988); *Commonwealth* v. *Hilton*, 398 Mass. 63, 64 (1986); *Commonwealth* v. *Amado*, 387 Mass. 179, 186 (1982). Further, "[c]ircumstantial evidence may be a thoroughly satisfactory basis for the conviction of the highest crimes." *Commonwealth* v. *Richmond*, 207 Mass. 240, 246 (1911). However,

[2]Although Brown chose to present further evidence, the Commonwealth's case also was sufficient for jury consideration at the close of all the evidence. See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 & n.5 (1978).

"if, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940).

We turn to the facts the jury could have found. On April 6, 1980, the twelve year old victim and her nephew, James, age two years and ten months, were at her family home in Wakefield. It was a warm, sunny day. Near the victim's family home was a wooded area that borders on the towns of Wakefield, Melrose, and Stoneham. There were main paths through the woods from each of the towns, as well as smaller paths. At approximately 4 P.M. or shortly thereafter, the victim and her nephew went for a walk in the wooded area. The children entered the woods from Wakefield. The two children stopped to eat some candy at a pile of boulders approximately one hundred yards into the woods. A man with a knife in a sheath on his belt approached the children from a different path. The man grabbed the victim and pulled her off the rock. The victim told the younger child to run. The child ran to some smaller rocks.[3] The younger child turned, and saw his aunt struggling with the man, grabbing him, and pushing him by the shoulders. The child saw a dog loose in the area. He saw his aunt fall and saw that she appeared to be hurt. Some of her clothing was off, and the man was standing over her holding a knife in front of him and taking off his clothes. The child heard his aunt again tell him to run. Because his aunt and the assailant were near the path from which the children had entered the woods, the younger child ran up the path from which the man had come, crossed a stream, and ran through the woods to a street where people took him to his grandparents' home. The child saw no one in the woods but the man.

At approximately 5 P.M., the police were notified and a search began. At 5:30 P.M., the body of the victim was found

---

[3]This testimony was corroborated by evidence that some of the child's candy was found at the smaller rocks.

near the boulders where the children stopped to eat candy. The victim had stab wounds on the face, neck (her throat appeared to have been cut), at the bottom of the chest, and in the back. There were some superficial scratches. Her clothing was found nearby. There also was some seminal fluid in the victim's vagina.[4] An expert opined that the murder weapon was a pointed knife with a blade at least two to three inches long and between one-half inch and three quarters of an inch in width.

The victim's nephew described the assailant as a white man, approximately twenty years of age with brownish hair, a medium build, and no facial hair. This fit Brown's physical description on April 6, 1980. On April 11, 1980, the child picked Brown's picture out of an array of twelve to fourteen photographs. The child said, "That's the guy, that's the guy in the woods."[5]

People living and working in the towns surrounding the woods said that the area was empty of people prior to 4 P.M. Shortly after 4 P.M., witnesses who knew Brown saw him take the path to the area that led directly to the boulders where the two children had stopped to eat candy. It was a two-minute walk from where Brown was seen to where the children stopped. At about 4:15 P.M., several bystanders heard a high-pitched scream followed by a rustling of leaves coming from the area of the boulders. At 4:25 P.M., a man matching Brown's description was seen walking from the scene of the crime and onto Ferdinand Street in Melrose, where the defendant lived.

On April 11, 1980, Brown told the police that he went walking with his unleashed dog in the woods that day and

[4] On the record before us, it appears that Brown's trial strategy was to concede that the victim "died in a horrible obscene way" and that the only issue was the identity of the culprit. On appeal the defendant does not argue that the evidence of murder in the first degree and rape of a child by force was not sufficient to submit to a jury.

[5] This evidence was admitted to corroborate the child's description of the assailant. The witness could not identify Brown at trial eight years later and did not remember selecting the photograph. Cf. Commonwealth v. Paszko, 391 Mass. 164, 171 n.8 (1984).

that he had his buckknife with him. At the interview with
the police, Brown had scratches on his forehead, neck, and
arms. The scratches looked like lines running down the sides
of his neck and arms. The scratches appeared to be recent
and were in the process of healing. Prior to the crime, Brown
had no visible scratches on his person.[6] Brown told the of-
ficers that the scratch marks were the result of a fight at
work. A coworker told the police that he had never seen
Brown in a fight at work. When asked by another coworker
if he had been in a fight, Brown did not reply.

When the police talked with Brown, he was wearing an
empty knife sheath on his belt. Brown told the officers that
he left the knife at his place of employment and that he used
the knife in his work as a furniture assembler. Brown drew a
picture of his knife for the officers. The wounds suffered by
the victim were consistent with having been inflicted by a
knife of the shape and dimensions shown in Brown's drawing.

The officers asked Brown if he would get the knife from
his place of employment. Brown agreed but asked the officers
to wait in the car while he went to get the knife. After ap-
proximately ten minutes, Brown had not returned and the of-
ficers went inside. Brown was at his workbench area. He told
the officers that he could not find the knife and that someone
must have taken it. A coworker of Brown told the police that
Brown did not look for the knife on his return from the police
interview but merely resumed working. Further, the co-
worker stated that Brown did not use the knife in the course
of his work. Another coworker said that Brown "constantly"
was in possession of the knife before the crimes but not
thereafter. Brown told the coworker that, when the police
asked him about the knife, he told them he had lost it. When
Brown went with the police to the scene of the crime, he be-
came "very, very pale . . . white as a ghost."

When the officers told Brown that witnesses had seen him
taking the path leading to the crime scene, Brown replied
that the witnesses were lying. A coworker said to the defend-

---

[6]Brown refused a police request that the scratches be photographed.

ant, "You did it [referring to the murder], didn't you." Brown replied, "Yeah, right." Brown had a sarcastic appearance when making the statement. Brown remained silent when another coworker accused him of the crime.

"In order to convict in a criminal case, it is not necessary to show that the crime could not have been committed by any person other than the defendant or that no other person had an opportunity to commit it, *Commonwealth* v. *Leach*, 160 Mass. 542, 551 [1894], nor is it necessary to prove the motive of a crime." *Commonwealth* v. *Dawn*, 302 Mass. 255, 263 (1939). "In cases in which [t]he evidence [is] largely circumstantial . . . it is not essential that the inferences drawn should be only necessary inferences. . . . It is enough that [the inferences] be reasonable and possible." (Citations omitted.) *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.'" *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).

There was sufficient evidence for the submission of the cases to the jury on the issue of Brown's guilt. Brown fit the description of the assailant. There was evidence, not disputed by Brown, that on April 6, he was walking in the woods with his unleashed dog, and that he had a knife in a sheath with him during his walk in the woods. The evidence from neighbors surrounding the woods was that no one but Brown was seen entering or leaving the woods prior to the crimes and after the commission of the criminal acts. After the crimes, but not before, Brown had scratches on his face, arms, and neck. That testimony was consistent with the child's statement that his aunt struggled with the assailant.

The jurors could conclude that Brown lied when he told police that (1) his knife was at his place of employment; (2) he looked for the knife at his place of employment but could not find it; (3) the knife was used in his job; (4) he did not take the path that led to the boulders where the children stopped to eat candy; and (5) he received the scratches from

a fight at work and (6) he lied to a coworker when he said he told the police he lost the knife.

Further, the jurors could find that Brown made an incriminating response to a coworker who asked him if he "did it" (i.e., the crimes) and Brown responded, "Yeah, right." The coworker's tone was serious; Brown's reply was "[m]ore or less under his breath," accompanied by "a sarcastic expression." Brown remained silent in response to an accusation by another coworker. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 57 (1982), and cases cited. "Actions and statements that indicate consciousness of guilt on the part of the defendant are admissible and, together with other evidence, may be sufficient to prove guilt." *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 52 (1975), and cases cited. "An admission may be [inferred] from conduct as well as from words." *Commonwealth* v. *Bonomi*, 335 Mass. 327, 348 (1957).[7]

Brown's reliance on *Commonwealth* v. *Curtis*, 318 Mass. 584 (1945), and *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), is misplaced. In neither of these cases could the defendant be placed at the crime scene at the time of the crime. There were neither eyewitness descriptions of the culprit nor physical marks on either of those defendants. In neither case did the Commonwealth have evidence that on the day of the crime those defendants were in personal possession of a weapon consistent with the murder weapon. Additionally, there was more evidence of consciousness of guilt in this case than in the two cases on which Brown relies.

---

[7]At trial, Brown attempted to discredit the Commonwealth's case with inconsistent statements by the child, by showing poor police work, and by showing that the police pursued a number of other suspects. On appeal, Brown, instead of evaluating the evidence in the light most favorable to the Commonwealth, argues that inferences inconsistent with the Commonwealth's case may be drawn from the evidence, and that the evidence of consciousness of guilt is "incomplete and ambiguous." It is for the jury, not an appellate court, to determine what inferences should be drawn from the evidence. We evaluate the evidence in the light most favorable to the Commonwealth notwithstanding any contrary evidence or inferences favoring the accused. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

"The circumstances of this case 'no one of which alone would be enough to convict [Brown], combine to form a fabric of proof that [is] sufficient [if believed] to warrant the jury[ ] finding beyond a reasonable doubt that [Brown] was the person who killed the victim[ ].' " *Commonwealth* v. *Cordle*, 404 Mass. 733, 741 (1989), quoting *Commonwealth* v. *Rojas*, 388 Mass. 626, 630 (1983). "Here, the jury had sufficient evidence . . . to draw plausible inferences that [Brown] was present at the time of the [stabbing], [had a weapon with him] . . . [and] evidence[d] a consciousness of his guilt. The evidence was substantial enough so that the question of guilt was not left to conjecture or surmise. . . . [There was no] error in the judge's denial of the motions for a required finding of not guilty." *Commonwealth* v. *Anderson*, 396 Mass. 306, 313 (1985).

The stay of proceedings is vacated. A judgment is to enter in the Supreme Judicial Court for the county of Suffolk directing that trial of the indictments proceed in the Superior Court.

*So ordered.*