COMMONWEALTH *vs.* MICHAEL BENNETT.

Barnstable. November 6, 1996. - January 8, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & MARSHALL, JJ.

*Burglary. Homicide. Felony-Murder Rule. Practice, Criminal,* Sentence, Duplicative punishment, Capital case.

Evidence at the trial of an indictment for burglary, including circumstantial evidence, was sufficient to warrant the jury's conclusion beyond a reasonable doubt that the crime was committed in the nighttime. [67-69]

Where a defendant was convicted of first degree felony-murder with armed burglary as the underlying felony, his conviction and sentence on a separate indictment for the same armed burglary was duplicative. [69-70]

INDICTMENTS found and returned in the Superior Court Department on April 13, 1992.

The cases were tried before *Gerald F. O'Neill, Jr.,* J.

*Richard M. Passalacqua* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On November 15, 1993, Michael Bennett was convicted following a trial by jury on one indictment charging first degree murder by reason of felony-murder (G. L. c. 265, § 1 [1994 ed.]), one indictment charging armed burglary (G. L. c. 266, § 14 [1994 ed.]),[1] and one indictment charging larceny (G. L. c. 266, § 20 [1994 ed.]). Bennett was sentenced to serve concurrent life terms on the murder and

[1]General Laws c. 266, § 14 (1994 ed.), reads in relevant part: "Whoever breaks and enters a dwelling house in the night time, with intent to commit a felony, or whoever, after having entered with such intent, breaks such dwelling house in the night time, any person being then lawfully therein, and the offender being armed with a dangerous weapon at the time of such breaking or.entry, or so arming himself in such house, or making an actual assault on a person lawfully therein, shall be punished . . . ."

For the purposes of this statute, "nighttime" is defined as "the time between one hour after sunset on one day and one hour before sunrise on the next day." G. L. c. 278, § 10 (1994 ed.).

burglary convictions; his larceny conviction was placed on file with his consent and is not part of this appeal.

The underlying felony on which the Commonwealth based its felony-murder charge was armed burglary. On appeal Bennett argues that the Commonwealth failed to present sufficient evidence that the crime was committed in the nighttime (one of the elements of the crime of armed burglary, see note 1, *supra*), so that he was entitled to a required finding of not guilty. Bennett also argues that the trial judge's imposition of concurrent sentences for both first degree felony-murder and the underlying felony of armed burglary is duplicative. Finally, Bennett requests that this court exercise its authority under G. L. c. 278, § 33E (1994 ed.), to order a new trial or to reduce the verdict to a lesser degree of guilt. We vacate both the judgment of conviction and the sentence for armed burglary. We affirm the judgment of conviction of murder in the first degree. We conclude that there is no reason to exercise our power under G. L. c. 278, § 33E.

1. We review the relevant evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme,* 395 Mass. 594, 595 (1985). On October 15, 1986, at approximately 4 P.M., Joan Marino returned to Logan International Airport from a trip to Florida. She had telephoned her husband, Ernest Marino, between 5:30 and 6:30 on the evening before to arrange for him to meet her and drive her to their home on Cape Cod. When her husband failed to arrive at the airport, she telephoned home approximately every fifteen minutes for some three hours, with no answer. She found this unusual because an answering machine customarily picked up incoming calls. Finally, at 8 P.M. that evening, she took the last flight to the Barnstable Municipal Airport. When she arrived there, she telephoned home, and again there was no answer. She then telephoned a friend, Olivia Marie Johnson, who transported her home.

When Mrs. Marino and Mrs. Johnson arrived at the house at approximately 9 P.M., Mrs. Marino noticed that all of the exterior and interior lights of the house were on. After entering the house, she discovered her husband's body on the stairs leading from his bedroom to his office. His chest was coated with very thick, dried blood, and his body was cold and "as hard as a rock." When she hugged his body, no blood stained her white blouse.

Because Mrs. Marino and Mrs. Johnson discovered that all the telephones in the house were inoperable, Mrs. Johnson left the Marino home and called the Barnstable police from a local restaurant. The police arrived at approximately 9:40 P.M., determined that entry to the house had been forced, and that the telephone wires to the house had been cut. Police rescue personnel determined that the victim was dead and that rigor mortis had set in. The next morning the Commonwealth's medical examiner performed an autopsy on the victim's body and determined that the cause of death was a shotgun wound to the left shoulder and neck region. He analyzed photographs taken at the crime scene and observed the apparent state of the body's rigor mortis. When questioned about the estimated time of the victim's death, the medical examiner said that he applied the "12-12-12 rule"[2] and that the state of rigor was consistent with the death of the victim occurring between 2 A.M. and 5 A.M. on October 15.

Paul Tawa, an acquaintance of Bennett, testified that he had telephoned the Barnstable police, anonymously, in January, 1987, to identify Bennett as the individual who had killed the victim. Tawa testified that Bennett had offered to sell him a handgun identified by other witnesses as belonging to the victim,[3] and that Bennett told him that he had acquired the gun during a robbery of a drug dealer.[4] Tawa said that Bennett sold him the victim's gun four or five days after the murder. Tawa further said that Bennett told him that he did not think anyone was at home when he entered the dealer's house, but that the victim appeared on the stairwell armed with two handguns. When confronted by Bennett, the victim "flinched"; Bennett shot him and then took one of his guns.

---

[2]The medical examiner elaborated on the "12-12-12 rule" at trial: "[D]uring the first [twelve] hours after death, rigor will begin to form; and it develops over those [twelve] hours. It's generally complete after those [twelve] hours and stays on full rigor for the next twelve hours. And over the last [twelve] hours, rigor starts to wane and eventually disappear[s], never to come back."

[3]Several witnesses placed the victim's gun in Bennett's possession after the murder. One witness testified that Bennett told him that the gun was "[h]ot from a score," presumably meaning that the gun had been stolen.

[4]Robert Melia of the State police said that on the night the victim was discovered, he observed a supply of high-quality cocaine, marihuana and hashish oil as well as drug paraphernalia at the Marino home, indicative of a "high level of distribution network."

Michael Dubis, a witness for the prosecution, testified that in January, 1993, while he and Bennett were both incarcerated in the Barnstable house of correction, Bennett told him that "one night" he went to rob a dealer who had "burned him on a couple of deals," but that the dealer "ended up dead," shot on the stairs in his home. When Dubis asked Bennett whether he had killed this man, Bennett replied, "Don't ask me that question, and I won't tell you no lies." Dubis also said that Bennett told him that he had found a briefcase with "hash oil" in the dealer's home, but that when he left the house "that night" he threw the briefcase into "some river" because he "didn't want anything to connect him to the guy that ended up dead that night."[5] Several weeks after this conversation, Dubis spoke to a State trooper, James Plath, about his conversation with Bennett. A week later Bennett threatened Dubis in jail, telling him, "Hey, Dubis, I killed Ernie Marino, and I'll kill you too, if I ever hear you mention my name to a cop."

2. We decide first whether there was sufficient evidence from which the jury could find beyond a reasonable doubt that the crime was committed in the nighttime, for it is on this ground alone that Bennett challenges his conviction of armed burglary.[6] See note 1, *supra.* Evidence of the burglary of the Marino home is circumstantial, but the Commonwealth's failure to provide direct evidence of the time of the crime is, of course, not fatal to the Commonwealth's case; circumstantial evidence is competent evidence to establish guilt. *Commonwealth* v. *Rojas,* 388 Mass. 626, 629 (1983), and cases cited. See *Commonwealth* v. *Turner,* 28 Mass. App. Ct. 909, 911 (1989) (direct evidence of time of break-in not required to prove that crime was committed during nighttime). Several of the Commonwealth's witnesses gave testimony relevant to establishing the time of the crime. Mrs. Marino said that she had last spoken to her husband between 5:30 and 6:30 P.M. on October 14, 1986, the day before she found him. She said that there was no answer when she

[5]On November 29, 1986, a briefcase belonging to the victim had been found on a nearby beach containing jewelry, a cigarette lighter, small black-topped vials of a thick, black liquid, and several clear plastic bags, indicative of drug sale paraphernalia.

[6]Armed burglary can, and in this case did, serve as the predicate for a conviction of murder in the first degree under the felony-murder rule. *Commonwealth* v. *Claudio,* 418 Mass. 103, 104 (1994).

telephoned her home on her arrival in Boston at approximately 4 P.M. on October 15, 1986, or for several hours thereafter. Eric Johnson, a friend of the Marinos, testified that he had been at the victim's house at approximately 2 P.M. on October 15, 1986, that he had rung the door buzzer, but that the victim did not answer. When Mrs. Marino finally arrived home on October 15, it was dark and she noticed that all of the exterior and interior lights of the house were on. She also testified to the condition of her husband's body when she discovered it on the evening of October 15. The Commonwealth's medical examiner testified that in light of the appearance of the victim's body in police photographs of the crime scene, and his examination of the body the next day, it would not be unreasonable to estimate the time of death as occurring between 2 and 5 A.M. on October 15, 1986. Finally, Dubis said that Bennett told him that the burglary and killing had occurred at night.

From this evidence we conclude that a rational trier of fact could find that the armed burglary occurred during the nighttime. In cases in which the evidence is largely circumstantial, it is not essential that the inferences drawn should be necessary inferences; it is sufficient that the inferences be reasonable and possible. *Brown* v. *Commonwealth*, 407 Mass. 84, 89 (1990), quoting *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926). Bennett argues that the jury could infer from the Commonwealth's evidence that the burglary occurred during the day. However, "to the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).

The Commonwealth offered no evidence of the time of sunrise on October 15, 1986, which, Bennett says, it is compelled to do. We disagree. The jury were entitled to rely on their general knowledge of matters commonly known within the community in determining what inferences may be drawn to establish a material fact not proved by direct evidence, such as the time of sunset or sunrise at a particular time of the year. *Commonwealth* v. *Kingsbury*, 378 Mass. 751, 754 (1979). The evidence most favorable to the Commonwealth is that death could have occurred at approximately 2 A.M. There is substantial authority establishing the reliability of estimates

of time of death by medical examiners, and they need not be proved infallible to be admissible. *Commonwealth* v. *Haas,* 373 Mass. 545, 563 (1977), *S.C.,* 398 Mass. 806 (1986). Even in the absence of evidence of the specific time of sunrise, the jury were warranted in concluding beyond a reasonable doubt that this crime occurred in the nighttime.

3. Bennett also argues that the judge's imposition of concurrent sentences for both first degree murder by felony-murder and the underlying felony of armed burglary is duplicative. We have agreed that "whenever the possibility exists that a jury might have reached a verdict of murder . . . on the basis of a felony-murder theory, a consecutive sentence may not be imposed for the underlying felony." *Commonwealth* v. *Wilson,* 381 Mass. 90, 124 (1980). We have extended this rule to apply to the imposition of concurrent sentences in felony-murder convictions. See *Commonwealth* v. *Mello,* 420 Mass. 375, 398 (1995); *Commonwealth* v. *Berry,* 420 Mass. 95, 113 (1995). The Commonwealth concedes that our holdings in *Mello* and *Berry* preclude the imposition of concurrent sentences for the felony-murder and armed burglary convictions, but argues that because the conviction for first degree felony-murder could also have been reached based on "the uncharged conduct of armed assault in a dwelling," the concurrent sentences imposed by the court are not duplicative. We are not persuaded.

The mere possibility that the jury reached their felony-murder conclusion based on the armed burglary charge precludes the imposition of concurrent sentences for both the felony-murder and armed burglary convictions, for "the basic premise of the criminal law [is] that ambiguities and doubts are to be resolved in favor of the accused." *Commonwealth* v. *Wilson, supra* at 125.[7] The appropriate remedy for duplicative convictions is to vacate both the conviction and sentence on the duplicative offense, and to affirm the conviction on the

[7]Compare *Commonwealth* v. *Pennellatore,* 392 Mass. 382 (1984), where we upheld concurrent first degree murder and felony sentences where the judge instructed the jury to specify the grounds for their conclusion, the jury found that their guilty verdict was supported independently on each of the three grounds for murder in the first degree — deliberate premeditation, extreme atrocity or cruelty, and felony-murder — and no possibility existed that felony-murder was the sole basis for the finding of murder in the first degree.

more serious offense. *Commonwealth* v. *Crocker,* 384 Mass. 353, 358 n.6 (1981).

4. We have considered the record as a whole and find no reason to exercise our authority under G. L. c. 278, § 33E, either to order a new trial or to reduce the verdict to murder in the second degree.

We vacate the judgment of conviction of armed burglary and the sentence imposed thereon and remand the matter to the Superior Court for entry of judgment consistent with this opinion. The judgment of conviction of murder in the first degree is affirmed.

*So ordered.*