COMMONWEALTH *vs.* LEO PIKE & another.[1]

No. 98-P-1449.

Bristol. May 9, 2000. - September 27, 2001.

Present: BROWN, PERRETTA, & GREENBERG, JJ.

*Assault and Battery. Civil Rights. Constitutional Law,* Freedom of speech and press, Assistance of counsel. *Practice, Criminal,* Failure to object, Witness, Instructions to jury.

At the trial of a criminal complaint alleging interference with the victims' civil rights by threat of force, threatening statements made by the defendant were a resort to epithets or personal abuse that were not in any proper sense the communication of information or opinion safeguarded by the Federal or State constitutions, and when the content of the statements was considered in light of the circumstances in which they were made, the evidence was sufficient to prove a threat of force. [653-654]

On a motion for a new trial following a criminal trial, the actions of the defendants' counsel did not constitute ineffective assistance of counsel, where counsel's failure to object to the admissibility of an unsigned note attributed to one of the defendants did not deprive that defendant of an otherwise available, substantial ground of defense, given that there was sufficient circumstantial evidence from which it could be inferred that the defendant had written the note [654-655]; where counsel's failure to challenge the constitutionality of the statute under which the defendants were charged as criminalizing protected speech was simply a recognition that such a motion would not succeed, given that the alleged protected speech was admissible to show the defendants' states of mind [655-656]; where counsel's calling of a witness who portrayed one of the defendants as an angry, belligerent person, while a debatable tactic, did not make a difference in the result, given that the testimony was cumulative of other testimony [656-657]; and where the failure of counsel to object to the jury instructions did not result in the defendants being convicted under an improper standard, given that the judge's instructions on the term "willful," while silent on the term "specific intent," were more than sufficent to inform the jury correctly as to all the elements of the crime charged, and given that the only references to the allegedly protected speech were for the proper limited purpose of showing the defendants' states of mind and intent [657-658].

COMPLAINTS received and sworn to in the New Bedford Division of the District Court Department on October 30, 1997.

[1]Jacqueline G. Pike.

The cases were tried before *John B. Leonard*, J., and motions for a new trial were heard by him.

*Kenneth G. Littman* for the defendants.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. Up until early September, 1997, Leo and Jacqueline Pike had a cordial relationship with their neighbors across the street. However, on September 6, Jacqueline Pike (Jackie) learned that her neighbors, two men, were sexual partners. Thereafter, Jackie and her husband, the defendant Leo Pike (Leo), engaged in acts of such open hostility against the men that criminal complaints ultimately issued. A District Court jury found Jackie and Leo both guilty of violating the men's civil rights. Leo was also found guilty of assault. On appeal, Jackie argues that she was entitled to a required finding of not guilty. She and Leo also argue that the trial judge erred in denying their motions for a new trial, brought on the basis of ineffective assistance of counsel. We affirm the judgments.

1. *The evidence.* Evidence was presented by the Commonwealth to show that Bradford Souza and the defendants had been neighbors for about fifteen years. David Brunelle had been residing with Souza for about four or five years. On the night of September 6, 1997, Souza and Brunelle were entertaining two of their friends on the patio in their backyard. The four people were discussing the relationship between Souza and Brunelle when Jackie appeared in the yard. Because Souza had never told Jackie that he was homosexual, he became uncomfortable and said, "Well, I guess now you know." She indicated that she had always known, stayed for a short time, and then returned to her home.

About a week later, Jackie attended a small party given by the men. Her behavior toward Souza was so antagonistic that other guests complained. Finally, Souza asked her to leave. Words were exchanged. As Jackie left the party, she turned to Brunelle and, in an angry and sarcastic voice, told him that he "had better calm down [his] so-called boyfriend."

When Souza arrived home from work a few nights later, September 17, Brunelle handed him an unsigned note that he had found on a table on the patio. It read, "Go back into your

closet and stay there." Souza, upset and believing that Jackie had written the note, called the police. Brunelle went across the street and confronted Jackie with the note. An argument ensued, the two exchanged insults, and Brunelle left.

On September 18, Souza arrived home from work and found his mother visiting with Brunelle. Shortly thereafter, Leo appeared at the door and stated that he wanted to speak with Souza. The mother told him to stay out of the house. Enraged, Leo barged past Souza's seventy-one year old mother and into the house. Using obscene language, he told Souza and Brunelle that he was "sick of the b------t, the friendship was over," that he was going "to kill [you] f-----g faggots," that he was going to take them outside and "f--k" them up, that they should stay off the streets or he would kill them, and that they had "f----d with the wrong person." Both Souza and Brunelle were intimidated and frightened, and Souza's mother was agitated. Souza called the police twice, and they removed Leo from the house upon their arrival.

From September 18 through to October 23, the Pikes engaged in conduct which was more annoying in the extreme than actionable. Then, on October 23, Jackie posted three signs on her porch. The signs faced Souza's house and read: (1) "Watch your young boys at all times. They're into chickens"[2]; (2) "Remember Jeffrey Charlie [Curley], he was murdered for sex by two homosexuals call your representative ask for the death penalty!!!"; and (3) "Protect our police, women and children call your representative ask for the death penalty to pass." The signs were posted from 7:30 A.M. until 1:00 P.M., during which time Jackie would point out the signs to passing motorists. People would stop, get out of their cars, and look to Souza's house.

Souza was devastated. He called Brunelle, his mother, and the police. When Souza's mother arrived and was walking into the house, Leo screamed, "How do you like having a c--------r for a son who likes to f--k little boys?" He called Souza a "faggot" and warned that he was to stay off the streets or he would "f-----g kill [him]." Jackie also screamed, challenging Souza to

---

[2]According to Souza, "chickens" was a term referring to sex with children.

a fight, taunting him, and yelling out, "Come on out in the street. Come on, let's fight woman to woman and show me what a real p---y you are," and, "You haven't seen anything yet, just wait." Souza would not leave his property, fearful that he would be beaten by the larger and stronger Leo. Souza's mother was trembling.

2. *Sufficiency of the evidence against Jackie.*[3] It is Jackie's verbal statements of October 23 that form the basis of the criminal complaint brought against her under G. L. c. 265, § 37. That statute provides in relevant part:

> "No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or otherwise interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States."

Taking the evidence in the light most favorable to the Commonwealth, it shows that on October 23, 1997, after posting signs on her property that drew attention to the victims' relationship in the most insulting and derogatory of terms, Jackie screamed at Souza, "Come on out in the street. Come on, let's fight woman to woman and show me what a real p---y you are," and, "You haven't seen anything yet, just wait." Souza was so terrified that he would not leave his property. Jackie's argument is, essentially, that these two statements must be viewed in isolation from her other actions and statements and that, as so taken, they constitute protected speech that is insufficient to prove beyond a reasonable doubt that she threatened force against the victims or otherwise interfered with their free exercise of their rights.

We begin by rejecting any notion that Jackie had a right protected by the Federal and State constitutions to hurl the threatening statements that she did at the victims. We need not enlarge upon the explanation set out in *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571-572 (1942):

> "[I]t is well understood that the right of free speech is not

---

[3]Leo does not argue that he was entitled to a required finding of not guilty on any of the complaints against him.

absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words — those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut*, 310 U.S. 296, 309-310 [1940]." (Footnotes omitted.)

When the content of Jackie's statements is considered in light of the circumstances in which she made them, we think it clear that they constituted threats of force within the comprehension of G. L. c. 265, § 37. See *Commonwealth* v. *Chou*, 433 Mass. 229, 234-235 (2001).

3. *Ineffective assistance of counsel.* A little over ten months after the defendants' convictions, they brought identical motions for a new trial in which they alleged that their attorney had failed to provide them with competent representation. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974); *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). The defendants' appeals from the denials of their motions were consolidated with their direct appeals from their convictions.[4] None of their claims, couched in terms of incompetency of trial counsel, requires detailed discussion.

---

[4]Because most of the defendants' allegations of incompetency of counsel turn on a failure to object to the various rulings of the trial judge, the Commonwealth argues that the question before us is not whether the defendants had the effective assistance of counsel at trial but whether any of the grounds set out in the motions for new trial give rise to a substantial risk of a miscarriage of justice. On the evidence and circumstances of this case, we see no determinative distinction between the two standards of review about which the parties argue. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994) ("if an omission of counsel does not present a substantial risk of a miscar-

·a. *Failure to object to the admissibility of the unsigned note.* This argument proceeds on the premise that had an objection been lodged against the Commonwealth's offer of the unsigned note attributed to Jackie, it would have been sustained. We do not agree.

Although there was no direct evidence to show that Jackie wrote and delivered the note to the victims, there was sufficient circumstantial evidence from which it reasonably could be inferred that she authored the note and left it on the victims' patio table.[5] See *Commonwealth* v. *Bennett*, 424 Mass. 64, 68 (1997).

Even assuming that the trial judge abused his discretion in admitting the note in evidence, we do not think that it fairly can be said, in light of all the evidence, that defense counsel's failure to object to the note "likely deprived the defendant[s] of an otherwise available, substantial ground of defense," *Commonwealth* v. *Saferian*, 366 Mass. at 96, or that "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. at 115.

b. *Failure to challenge the statute.* It is the defendants' claim that their trial counsel was ineffective because he failed to challenge the constitutionality of G. L. c. 265, § 37, as applied to their conduct of October 23. This argument, as best we understand it, appears to proceed on the assumption that the defendants were convicted on the basis of the signs they posted on their property on October 23, 1997. To bolster their claim, they point to the fact that Leo was found not guilty on the complaint charging him with a civil rights violation based upon his conduct of September 18, conduct which they claim involved allegations similar to their alleged conduct of October 23.

We begin by rejecting any notion of inconsistent verdicts.

---

riage of justice in a situation such as this, there is no basis for an ineffective assistance of counsel claim under either the Federal or State Constitutions").

[5]Specifically, there was evidence to show that Jackie was the only neighbor who had a computer and use for the type of paper upon which the note was presented, that she was the only neighbor to whom the victims reluctantly disclosed the nature of their relationship, that she made a sarcastic comment about that relationship at a neighborhood party a week after the victims' disclosure to her, and that the victims found the note on their patio table four days after asking her to leave their party because of her behavior.

"Inconsistency of verdicts in criminal cases is not a matter for judicial inquiry unless the inconsistent verdicts are impossible as matter of law." *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 88 (1993). The complaints against Leo and Jackie of which they were found guilty were based upon their *verbal* statements of October 23.

Even assuming that the signs, which were not posted until that date, contained constitutionally protected speech (but see *Chaplinsky* v. *New Hampshire*, 315 U.S. at 571-572; *Commonwealth* v. *Robicheau*, 421 Mass. 176, 182-183 [1995]; *Commonwealth* v. *Chou*, 433 Mass. at 234-235), any protected content was nonetheless admissible to show Jackie and Leo's states of mind in making those statements. See *Wisconsin* v. *Mitchell*, 508 U.S. 476, 489 (1993) ("First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). Counsel cannot be deemed ineffective on the basis of an alleged failure to bring and pursue a motion that cannot succeed. See *Commonwealth* v. *Levasseur*, 32 Mass. App. Ct. 629, 635-637 (1992), cert. denied, 506 U.S. 1053 (1993), and authorities therein cited.

c. *Witness selection.* A Fairhaven police officer, Pamela Burgeault, was called as a witness by the defense to testify to the events of September 18, 1997, that formed the basis of the assault complaint against Leo. Leo argues that Burgeault's testimony served no purpose other than to show that, on that date and contrary to Leo's testimony, Leo was an aggressor who refused to cooperate with the police.

Although we think defense counsel had a purpose in calling Burgeault (to show that Leo was on the street and not in the house when she arrived at the scene), we will assume for purposes of decision that her testimony also served, as Leo claims, to portray him as an angry, belligerent person. That assumption only leads us to conclude that Burgeault's testimony was cumulative of that given by Souza, Brunelle, and Souza's mother, and was consistent with all the other evidence presented by the Commonwealth. Accordingly, we conclude that defense counsel's tactical decision, even if debatable, could not have made a difference in the result, let alone have deprived Leo of

an otherwise substantial ground of defense to the complaints against him. See *Commonwealth* v. *Saferian*, 366 Mass. at 96.

d. *The jury instructions.* Two claims are made in respect to defense counsel's failure to object to the jury instructions. The first of the two claims is that the defense counsel was ineffective in not objecting to the trial judge's failure to instruct the jury correctly on the issue of specific intent. They claim that the trial judge's failure to instruct on the need for proof of specific intent allowed them to be convicted upon the mere showing of the defendant's interference with the affairs of others. The claim fails. As to G. L. c. 265, § 37, the trial judge instructed:

> "The defendants' acts must have been willful. The defendants' acts were willful if they were done either with a specific purpose of interfering with the alleged victim, that is Mr. Souza's enjoyment of his rights, that is his sexual orientation, or it was done because the victim had exercised that right. Either interfering with the right or because he had already exercised it."

We conclude that the trial judge's instructions on the term "willfully," while silent on the term "specific intent," were more than sufficient to inform the jury correctly as to all the elements of the crime charged. See *Commonwealth* v. *Gunter*, 427 Mass. 259, 268-269 (1998); *Commonwealth* v. *Stephens*, 25 Mass. App. Ct. 117, 121-123 (1987).

Nor do we see merit in the defendants' second claim, that is, an argument based upon conclusory statements to the effect that the trial judge's instructions were so confusing that it was likely that the defendants were convicted on the basis of protected speech. Again assuming for purposes of decision only that the content of the posters was constitutionally protected, we note that the prosecutor, in his closing argument, spoke to the signs in terms of the limited purpose of showing the defendants' state of mind and intent in respect to the verbal statements in issue. Further, the trial judge made no reference to any specific evidence in his final instructions and, instead, confined himself to repeated correct statements of the law as to the nature and elements of a criminal violation of a person's civil rights.

We see no reason to disturb the convictions on the basis of trial counsel's alleged failures in respect to the jury instructions.

*Judgments affirmed.*