#29759-a-SPM & PJD
**2023 S.D. 19**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                        Plaintiff and Appellee,

   v.

BILLY JOE ROBERTSON,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CRAIG A. PFEIFLE
Judge

* * * *

TODD A. LOVE
Rapid City, South Dakota                      Attorney for defendant
                                              and appellant.


MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

* * * *

CONSIDERED ON BRIEFS
MAY 25, 2022
OPINION FILED **04/19/23**

#29759

MYREN, Justice, and DEVANEY, Justice

[¶1.]     **Justice Myren delivers the majority opinion of the Court on Issue 1 and Issue 2.  Justice DeVaney delivers the majority opinion of the Court on Issue 3.**

[¶2.]     **MYREN, Justice, writing for the court on Issue 1 and Issue 2.**

[¶3.]     Billy Robertson was tried for first-degree burglary, two counts of aggravated assault (charged alternatively), and grand theft.  During and after his jury trial, Robertson made motions for judgment of acquittal, which the circuit court denied.  The jury convicted Robertson of first-degree burglary, aggravated assault, and grand theft.  Robertson appeals.  We affirm.[1]

## Facts and Procedural History

[¶4.]     On July 21, 2020, Bradley Tucker woke at 4:30 a.m. in his home in Rapid City, South Dakota, when he heard screeching tires and a smash in his driveway.  He looked outside his bedroom window and saw his GMC Sierra parked partway out of his garage.  Tucker told his wife to call 911 and immediately ran downstairs.  When Tucker reached his driveway, he saw Robertson standing between his boat and pickup with a tackle box in his hand.  Robertson stated, "Stop. I'm taking it[,]" and Tucker said, "No.  You're not taking it."  Robertson responded, "This guy saved my life and I'm taking it."  Robertson dropped the tackle box, ran, and entered Tucker's pickup through the driver's side door, which was already open.

---

1.     On appeal, Robertson raises no issues regarding the validity of his conviction for grand theft.

-1-

Tucker chased Robertson but slipped. By the time Tucker regained his balance, Robertson had put the pickup into gear.

[¶5.] Tucker reached inside the open driver's door and grabbed "ahold of something" to prevent Robertson from closing the door. Tucker was dragged alongside the moving pickup until he positioned his feet onto a step below the driver's door. He reached into the cab and placed Robertson in a headlock, at which point Robertson said, "Let's go for a fucking ride." Ultimately, Tucker pulled Robertson out of the cab while the pickup was still moving. Tucker landed on the left side of his body, and Robertson landed on top of him. Robertson jumped up, ran to a red Ford pickup, and drove away. Tucker's pickup continued down the block until it ran into his neighbor's garage. Tucker backed his pickup a few feet away from the neighbor's garage and shut it off. When Tucker opened the passenger door, a whiskey bottle fell out of the pickup. Tucker eventually rode with police to a different location, where he identified Robertson as the person who attempted to take his pickup.

[¶6.] A Pennington County grand jury indicted Robertson on the charges of first-degree burglary (SDCL 22-32-1(3)); alternative counts of aggravated assault under circumstances manifesting extreme indifference to human life (SDCL 22-18-1.1(1)) or aggravated assault by attempting by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm (SDCL 22-18-1.1(5)); grand theft (SDCL 22-30A-1 and SDCL 22-30A-17); and alternative counts of aggravated assault on a law enforcement officer under circumstances manifesting extreme indifference to human life (SDCL 22-18-1.1(1) and SDCL 22-18-1.05) or

aggravated assault on a law enforcement officer by attempting by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm (SDCL 22-18-1.1(5) and SDCL 22-18-1.05).[2] The State filed a part II information that alleged Robertson was an habitual offender.

[¶7.]     Tucker was the State's first witness at the jury trial. He testified that he left the keys to his pickup on his deep freezer, about 30 feet into his garage. He described his interactions with Robertson as outlined above. Tucker described his injuries, including road rash on his left arm and leg and the loss of his big toenail from his left foot. Tucker stated that he had his wife write out his report for law enforcement because he was shaking too badly to do it himself. Tucker testified that his pickup was totaled, and his insurance paid him $28,600 for damages.

[¶8.]     South Dakota Highway Patrolman Chris Regan testified that he responded to an attempted vehicle theft at Tucker's residence. Patrolman Regan testified that it was 5:41 a.m. when he arrived at the scene. Patrolman Regan said he spoke with Tucker and noticed that his pickup went down a "pretty steep" hill from Tucker's house into his neighbor's garage. Robertson was detained as part of an investigation of another incident at a different residence, also reported around 4:30 a.m. Patrolman Regan testified that he took Tucker to that location to see if Tucker would identify Robertson as the individual who attempted to steal his pickup. After Tucker identified Robertson, Patrolman Regan took Tucker back to

---

2.     On April 16, 2021, the State dismissed the alternative counts of aggravated assault on a law enforcement officer.

his home, where he completed the written statement that his wife wrote out for him.

[¶9.]     Rapid City law enforcement officer Brendan Lenard responded to a call to look for the red Ford pickup.  He testified that it was still dark outside when he found it.  He testified that dawn was breaking when he began taking pictures of that vehicle.

[¶10.]     Anthony Picketpin, another Rapid City law enforcement officer, was searching for the suspect who fled Tucker's residence in the red Ford pickup.  After being advised that the pickup had crashed, Officer Picketpin set up a perimeter around the area where the pickup was located.  He testified that he heard noises coming from the bushes around a house and saw a person standing in a driveway wearing a red and white jersey.  This person was out of breath and appeared to have just finished running.  Officer Picketpin detained the person, who was identified as Robertson.

[¶11.]     Sergeant Philip Koch testified that he arrived at Tucker's home at 7:30 a.m., roughly two and one-half to three hours after the incident.  He stated that he received a statement from Tucker and described the injuries Tucker suffered.  Sergeant Koch testified that he also spoke with Robertson.  The State asked Sergeant Koch if he was able to speak with Robertson about the events that occurred at Tucker's residence.  He responded, "[y]es[,]" but then clarified that he

"spoke with him regarding the events of the early morning[.]"[3] The State then asked:

> State: Did [Robertson] make any statements specifically about what had occurred at Country Club Drive?
>
> Koch: No. By that point he had invoked his right to an attorney.
>
> State: Okay. What was his demeanor like when you were speaking with him about Country Club Drive?
>
> Koch: His thought process was rather scattered. He was sweating; difficult to keep him on topic. He was nervous, upset. He cried at times and raised his voice several times. He claimed to have been drinking and didn't offer any recollection of the - - of certain events that had happened that evening.

[¶12.] Bincy Thankachan, a Rapid City Police Department forensic examiner, documented the crime scenes involving the red Ford pickup and Tucker's pickup. She took pictures of the red Ford pickup and Tucker's pickup. She described the damage to Tucker's pickup and stated she recovered an empty whiskey bottle from the driveway where Tucker's pickup was parked. Thankachan took buccal swabs from Tucker, Tucker's wife, various places on Tucker's pickup, the whiskey bottle, Tucker's garage doorknob, and Tucker's boat located in his garage.

[¶13.] Jessika Simon, a forensic scientist, testified that the DNA found on the mouth of the empty whiskey bottle came from two individuals. One DNA source matched Robertson's DNA. There was insufficient DNA material from the other contributor for Simon to make any genetic comparisons. Simon testified about the

---

3. The State had initially charged Robertson with similar charges arising out of another incident that had occurred earlier that morning at another residence. The State did not pursue the prosecution of the charges from that incident. In response to a defense request, the circuit court placed limits on what evidence could be admitted regarding those earlier events. Sergeant Koch's abbreviated response appears to be a reference to a discussion with Robertson about those earlier events.

strength of the match with Robertson and explained, "I would not expect to see this DNA profile again in the world population unless if there was an identical twin."

[¶14.] After the State rested, Robertson made a general motion for a judgment of acquittal as to all charges based on the State's failure to establish the necessary elements of the offenses. Then, concerning the first-degree burglary charge, Robertson specifically argued that the State did not prove that he entered an occupied structure. As to the aggravated assault charge, Robertson contended that the State failed to prove that Tucker sustained injuries under circumstances manifesting an extreme indifference to the value of human life or that the pickup was used as a physical menace or as a deadly weapon to place Tucker in fear of imminent harm. The circuit court denied Robertson's motion for judgment of acquittal.

[¶15.] The jury found Robertson guilty of first-degree burglary in violation of SDCL 22-32-1(3), aggravated assault in violation of SDCL 22-18-1.1(5) (physical menace), and grand theft in violation of SDCL 22-30A-17. Following the jury trial, Robertson renewed his motion for judgment of acquittal. The circuit court denied it again.

[¶16.] Robertson pled no contest to the allegation in the part II information. The circuit court sentenced Robertson to 40 years imprisonment with 15 years suspended for first-degree burglary, 25 years imprisonment with five years suspended for aggravated assault, and 15 years imprisonment with five years suspended for grand theft. All the sentences were concurrent. Robertson appeals.

## Analysis

### 1. Whether the circuit court committed plain error by allowing Sergeant Koch to testify that Robertson invoked his right to an attorney.

[¶17.]     During Sergeant Koch's examination, the State inquired whether he had spoken with Robertson about what had occurred at Tucker's address. He stated, "[y]es[,]" but then clarified that he had spoken with him about "events of the early morning[.]"[4] The State then asked whether Robertson had made any statement about what had occurred at Country Club Drive, Tucker's residence. Sergeant Koch responded: "No. By that point he had invoked his right to an attorney." Robertson did not raise any objection to this testimony. The State immediately moved to a different line of questions and never revisited this answer in any respect.

[¶18.]     When an issue is not preserved for appeal, this Court is limited to a review for plain error. *State v. McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d 725, 729. "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200 (alterations in original) (quoting *State v. Jones*, 2012 S.D. 7, ¶ 14, 810 N.W.2d 202, 206). "We invoke our discretion under the plain error rule cautiously and only in 'exceptional circumstances.'" *Id.* (quoting *Jones*,

---

4.     As noted previously, Robertson was being investigated for other events that occurred prior to the incident at Tucker's residence.

2012 S.D. 7, ¶ 14, 810 N.W.2d at 206). With respect to the third prong, the appellant bears the burden of proving that the error was prejudicial, which "requires a showing of a 'reasonable probability' that, but for the error, the result of the proceeding would have been different." *State v. Babcock*, 2020 S.D. 71, ¶ 45, 952 N.W.2d 750, 763 (quoting *State v. Fifteen Impounded Cats*, 2010 S.D. 50, ¶ 33, 785 N.W.2d 272, 283). "Establishing all four prongs is onerous, 'as it should be.'" *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 1429, 173 L. Ed. 2d 266 (2009)).

[¶19.]     Robertson contends it was plain error for the circuit court to allow Sergeant Koch to testify that Robertson had invoked his right to an attorney. He argues that this error highlighted in the jurors' minds that he requested an attorney, leading them to conclude that he was guilty. He further contends that Sergeant Koch's answer could be construed as a comment on Robertson exercising his Fifth Amendment right to remain silent.

[¶20.]     Sergeant Koch's response did not directly implicate Robertson's invocation of his right to remain silent. Instead, it referenced the invocation of his right to legal counsel. We addressed a similar scenario in *State v. Randle*, in which the State asked a detective at trial, "Did [defendant] invoke his right to an attorney while you were speaking with him?" 2018 S.D. 61, ¶ 23, 916 N.W.2d 461, 467. Unlike the scenario here, the defendant's counsel in *Randle* "objected to the question before any answer was given." *Id.* ¶ 12, 916 N.W.2d at 465. The *Randle* Court determined that the circuit court did not abuse its discretion when it denied the defendant's motion for a mistrial. *Id.* ¶ 28, 916 N.W.2d at 468.

[¶21.] In *Randle*, this Court noted that the State's inquiry about whether the defendant invoked his right to an attorney, although not relevant or proper, was not prejudicial because the State's strategy did not involve an assertion that the defendant's exercise of his right to seek the advice of an attorney suggested guilt. *Id.* ¶ 27, 916 N.W.2d at 468. The Court also considered whether the State's question was an indirect allusion to Randle's failure to take the stand and concluded that "[t]he circuit court did not err in determining that the [State's] question alone did not implicate Randle's right to remain silent." *Id.* ¶¶ 25, 28, 916 N.W.2d at 467, 468.

[¶22.] Here, unlike in *Randle*, the jury heard testimony that Robertson invoked his right to an attorney. The State did not solicit this testimony. Upon hearing the answer, the State moved to another line of questioning and never revisited the unsolicited response in any respect. Robertson's counsel did not object, and the circuit court took no action of its own volition. Given the circumstances, Robertson has not established that it was plain error for the circuit court not to intervene when Sergeant Koch gave his unsolicited answer.

[¶23.] Robertson also contends that the State made an indirect allusion to his invocation of his right to remain silent when the State asked Sergeant Koch whether Robertson made any statements about the events at issue. Sergeant Koch's response to the State's preceding question indicated that Robertson did speak to him about some events that evening. In response to the State's next question, after explaining Robertson's demeanor, Sergeant Koch related Robertson's explanation that he did not recall certain events because he had been drinking.

Given the totality of the State's colloquy with Sergeant Koch, it does not appear the State unfairly used Robertson's silence to infer guilt. Consequently, we conclude there was no plain error.

[¶24.] Even if there was plain error, Robertson has not shown a "reasonable probability" that, but for the State's question and Sergeant Koch's response, the result of the proceeding would have been different. Therefore, he has not met his burden of establishing the third prong of plain error review.

### 2. Whether the circuit court erred by denying Robertson's motion for judgment of acquittal concerning the aggravated assault charge.

[¶25.] This Court reviews the "denial of a motion for judgment of acquittal de novo." *State v. Armstrong*, 2020 S.D. 6, ¶ 12, 939 N.W.2d 9, 12 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). "[A] motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law[.]" *State v. Ahmed*, 2022 S.D. 20, ¶ 14, 973 N.W.2d 217, 221 (first alteration in original). "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d 62, 68 (quoting *Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d at 83). "[T]he jury is the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* (alteration in original) (quoting *Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d at 83). "In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility

of witnesses, or weigh the evidence." *Id.* (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 33, 889 N.W.2d 404, 413).

[¶26.]    Robertson argues that there is insufficient evidence that he used Tucker's pickup as a "deadly weapon" in a physically menacing manner.  He contends that the evidence presented at trial shows that he was simply trying to drive away in Tucker's pickup when Tucker jumped into the pickup to pull him out. Robertson asserts that he was not holding onto Tucker inside the pickup cab and did not push Tucker out of the pickup while it was moving.

[¶27.]    SDCL 22-18-1.1(5) provides that "[a]ny person who . . . [a]ttempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm . . . is guilty of aggravated assault."  "[D]eadly weapon" is defined as "any firearm, stun gun, knife, or device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]"[5]  SDCL 22-1-2(10).  "Physical menace 'requires more than words: there must be some physical act on the part of the defendant.'"[6]  *State v. Scott*, 2019 S.D. 25, ¶ 19, 927 N.W.2d 120, 127 (quoting *In re R.L.G.*, 2005 S.D. 119, ¶ 10, 707 N.W.2d 258, 261).

---

5.    Jury instruction No. 31 defined "[d]angerous or deadly weapon" using the same definition.

6.    Jury instruction No. 32 defined "[p]hysical menace" as "to threaten in a physical manner. . . . requir[ing] something more than words; there must be some physical act on the part of the defendant."

[¶28.] "Although an automobile is not calculated or designed to inflict death or serious bodily harm, it can be used in a manner that is likely to inflict death or serious bodily harm and, when so used, it constitutes a dangerous weapon within the meaning of SDCL 22-1-2[(10)]." *State v. Barrientos*, 444 N.W.2d 374, 377 (S.D. 1989) (alteration in original) (quoting *State v. Seidschlaw*, 304 N.W.2d 102, 105 (S.D. 1981); *see State v. Koester*, 519 N.W.2d 322, 325 (S.D. 1994) ("A most dangerous weapon was used by all of the Elk Point drivers on the night of this incident, a half ton or so of moving steel[.]").

[¶29.] Tucker testified that Robertson had put his pickup into gear by the time he jumped on the side of the pickup. He stated that he was holding on to something in the pickup while the pickup dragged him for a few feet. Tucker testified that after he got his feet on the step under the driver's door, he was able to reach into the cab and put Robertson in a headlock. At this point, Robertson said, "Let's go for a fucking ride." Tucker testified that while in the headlock, Robertson continued to drive the truck around the corner into the street before Tucker was able to pull him from the cab. Although not an element of the charged offense, Tucker suffered injuries, including road rash on his left arm and leg and loss of a toenail from his left foot.

[¶30.] Robertson argues that his use of a vehicle must be such that it is not just *possible*, but rather, *probable* that it would result in serious bodily harm, citing this Court's interpretation of the definition of a dangerous or deadly weapon in *Seidschlaw*, 304 N.W.2d at 105–06. He also contends that the State cannot rely

solely on his statement to Tucker and must instead show his actions constitute a physical menace.

[¶31.] As we recently clarified when discussing a charge under SDCL 22-18-1.1(5) in *State v. Peneaux*, "[t]he gravamen of the offense is the attempt to put a person in fear of imminent serious bodily harm." 2023 S.D. 15, ¶ 37, ___ N.W.2d ___ (alteration in original) (quoting *Ahmed*, 2022 S.D. 20, ¶ 15, 973 N.W.2d at 221). We further explained that the relevant question is not whether the alleged victim was in fear and "[i]nstead, the focus is on what the defendant was *attempting* to do[.]" *Id.* ¶ 39. Therefore, in determining whether the elements of this offense have been established, both words and actions may be pertinent.

[¶32.] The State's theory of the case was that Robertson was attempting to put Tucker in fear of imminent serious bodily harm by using Tucker's pickup in a manner that was likely to cause such harm. The evidence shows that Robertson continued to drive the pickup with Tucker hanging on to something inside the open door. While Robertson was in the pickup cab with Tucker, he stated, "Let's go for a fucking ride." Robertson's actions and statement are sufficient to show that he attempted to put Tucker in fear of imminent serious bodily harm by physical menace with a deadly weapon.

[¶33.] "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *State v. Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d 620, 626 (quoting *State v. Bucholz*, 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905). When the evidence is viewed in a light most favorable to the verdict, a rational trier of fact

could have found the "physical menace" and "deadly weapon" elements necessary for an aggravated assault conviction. The circuit court did not err in denying Robertson's motion for judgment of acquittal on aggravated assault.

[¶34.] **DEVANEY, Justice, writing for the Court on Issue 3.**

> **3. *Whether the circuit court erred by denying Robertson's motion for judgment of acquittal concerning the first-degree burglary charge.***

[¶35.] Under SDCL 22-32-1(3), "[a]ny person who enters or remains in an occupied structure, with intent to commit any crime, unless the premises are, at the time, open to the public or the person is licensed or privileged to enter or remain, is guilty of first degree burglary if . . . [t]he offense is committed *in the nighttime.*" (Emphasis added.) "Nighttime" is defined by statute as "the period between thirty minutes past sunset and *thirty minutes before sunrise.*"[7] SDCL 22-32-15 (emphasis added).

[¶36.] On appeal, Robertson asserts that because "nighttime is statutorily defined only in relation to sunrise" *and* the State did not present evidence at trial establishing when the sun actually rose, the circuit court erred in denying his motion for judgment of acquittal on the charge of first-degree burglary. In his view, when "nighttime ended" is not something jurors could determine through "common sense and experiences in life[.]" He thus asserts that "[t]he precise time of sunrise is a lynch pin, without which one cannot determine, under the definition provided under South Dakota law, whether any event occurred during the nighttime."

---

7. The circuit court's instruction defining "nighttime" used the same definition as in SDCL 22-32-15.

[¶37.]     As explained in Issue 2, we review whether the circuit court erred in denying Robertson's motion for judgment of acquittal de novo.  Further, our law is well settled.  "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt."  *State v. At The Straight*, 2023 S.D. 1, ¶ 20, 984 N.W.2d 715, 719 (quoting *Bausch*, 2017 S.D. 1, ¶ 33, 889 N.W.2d at 413).  In that regard, we focus on the testimony and evidence in the record and the reasonable inferences that can be drawn therefrom to sustain the jury's verdict and not, as suggested by Robertson, the absence of evidence in the record establishing the precise time the sun rose on July 21, 2020.

[¶38.]     Although the State did not present evidence establishing the specific time the sun rose on July 21, 2020, the jury was instructed on the definition of "nighttime."  Therefore, to determine whether the evidence and all favorable inferences that can be drawn therefrom support a finding beyond a reasonable doubt that the burglary was committed at least thirty minutes before sunrise, we must focus on the evidence that was before the jury as to the timing of the burglary and the number of events that occurred before the sun rose.  *See State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313 ("viewing the evidence in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted)).

[¶39.]     The jury heard testimony from Tucker, who lives on Country Club Drive, that it was 4:30 in the morning when he heard the crash in his driveway and

ran down to find Robertson in his driveway. The jury then heard Tucker describe several events that occurred thereafter while he was attempting to prevent Robertson from stealing his pickup. Tucker testified that he observed Robertson standing between his boat and pickup holding Tucker's tackle box, and after being confronted by Tucker, Robertson dropped the tackle box, ran around Tucker's pickup, and got inside. Tucker explained that he slipped while trying to catch Robertson but then got up and tried to grab ahold of something inside the open door of his pickup while Robertson was trying to drive away. After he was able to get a headlock on Robertson in an effort to pull him out, both of them eventually fell out of the moving pickup. Robertson then got up and ran back to the red pickup in which he came and drove away.

[¶40.] The jury also heard testimony that sometime after Robertson fled the scene in the red pickup, Officer Lenard, who was responding to a call of shots fired in the Canyon Lake Park area, was asked to look for this red pickup. He testified that while he was driving down Jackson Boulevard, he located the red pickup on 6th Avenue crashed into a tree. According to Officer Lenard, it was still dark outside when he found the pickup. He testified that he notified dispatch, then waited for another officer to arrive. Officer Lenard explained that after the other officer arrived, they first "cleared the vehicle[,]" which was still running. He and the other officer also secured both Jackson Boulevard and 6th Avenue and then "stood by and waited for more orders."

[¶41.] While waiting for more orders, Officer Lenard began taking pictures of the pickup. He testified that "everything was a little slow[]" and "by the time the

pictures were taken, it was becoming dawn." He did not say the sun was rising. Officer Lenard took multiple photos from different angles. Notably, three of the photos introduced into evidence depict complete darkness in the background; two show very faint light in the sky behind the pickup; and two show slightly more light. The jury could reasonably determine from these photos and the officer's testimony that the sun had still not risen at this point.

[¶42.]     Importantly, jurors can take into account matters of common knowledge. Relevant here, jurors could rely on the common knowledge that there is a gradual period prior to sunrise in which darkness fades to light and could apply such knowledge when considering the timing of the events in question. Further, in light of the evidence presented in this case, jurors did not need to have precise knowledge as to the specific time the sun rose on the date of the burglary to be able to determine whether Robertson committed the burglary thirty minutes before sunrise.[8] The jurors heard testimony and viewed photographic evidence in the record regarding the multiple events that transpired after Tucker found Robertson in his driveway and the tasks undertaken thereafter—all before dawn. From this evidence, the jurors could reasonably infer, without resorting to mere speculation, that at least thirty minutes passed between the time Robertson entered Tucker's garage and when the sun later rose, making this offense a burglary committed in the nighttime.

---

8.     Although such information is not required given the other evidence presented in this case, other courts have determined that the time of sunset or sunrise at a particular time of the year is a matter "commonly known within the community[.]" *See, e.g., Commonwealth v. Bennett*, 674 N.E.2d 237, 240 (Mass. 1997).

[¶43.] Moreover, as the court in *Commonwealth v. Bennett* explained, even if a jury can infer from the evidence that a burglary occurred outside the definition of *nighttime*, "to the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.'" 674 N.E.2d 237, 241 (Mass. 1997) (citation omitted). Because a review of the evidence in a light most favorable to the prosecution supports the jury's verdict finding the essential elements of first-degree burglary beyond a reasonable doubt, Robertson's motion for judgment of acquittal on the charge of first-degree burglary was properly denied.

**Conclusion**

[¶44.] Robertson has not established plain error in regard to Sergeant Koch's testimony and has not established that the circuit court erred in denying Robertson's motion for a judgment of acquittal on his aggravated assault and first-degree burglary charges.

[¶45.] We affirm.

[¶46.] SALTER, Justice and STOLTENBURG, Circuit Court Judge, concur.

[¶47.] JENSEN, Chief Justice, concurs on Issue 1 and Issue 2, and dissents on Issue 3.

[¶48.] MYREN, Justice, dissents on Issue 3.

[¶49.] STOLTENBURG, Circuit Court Judge, sitting for KERN, Justice, who deemed herself disqualified and did not participate.

MYREN, Justice (dissenting).

[¶50.] To establish first-degree burglary, the State must prove beyond a reasonable doubt that the defendant's conduct occurred "in the nighttime." SDCL

22-32-1(3). This is the sole element that distinguishes first-degree burglary from second-degree burglary. *See* SDCL 22-32-3. "Nighttime" is not some amorphous concept. The Legislature precisely defined it as "the period between thirty minutes past sunset and thirty minutes before sunrise." SDCL 22-32-15. Second-degree burglary is a Class 3 felony with a maximum sentence of 15 years imprisonment in the state penitentiary. SDCL 22-32-3; SDCL 22-6-1(6). First-degree burglary is a Class 2 felony with a maximum penalty of 25 years imprisonment. SDCL 22-32-1; SDCL 22-6-1(5). Thus, proof that the burglary occurred "in the nighttime" exposes the defendant to an additional ten years in the state penitentiary.

[¶51.]     The State charged Robertson with first-degree burglary but not second-degree burglary. With that election, the State accepted the responsibility to prove beyond a reasonable doubt that the burglary occurred "in the nighttime," as defined in the statute. The State's evidence establishes that the burglary happened at about 4:30 a.m. when noises outside Tucker's residence awakened him. It was still dark when the burglary occurred. There was also evidence that it was dark when law enforcement discovered Robertson's abandoned pickup at a different location a short time later.[9] The fact that it was dark at the time of the burglary (or for a

---

9.     While the time of this discovery was not directly established by the evidence, during closing arguments, the prosecutor represented to the jury that the abandoned pickup was found "approximately ten minutes" later, "just under two miles" from the crime scene. Some of the photographs taken of the pickup by law enforcement at this time show darkness, while others show twilight breaking behind the trees where the pickup was photographed. "In its most general sense, twilight is the period of time before sunrise and after sunset, in which the atmosphere is partially illuminated by the sun, being neither totally dark [n]or completely lit." *Definitions of Twilight*, NATIONAL WEATHER SERVICE, weather.gov/fsd/twilight (last visited April 3, 2023). "It's

(continued . . .)

short time after) provides no information about whether the burglary occurred within or outside the 30-minute timeframe before the sun rose. This is because the record contains no evidence about when the sun rose on July 21, 2020.

[¶52.]        In Rapid City, South Dakota, sunrise and sunset change daily and vary more than two hours between the summer and winter solstices.[10] Sunrise and sunset also differ depending on geographical location.[11] Still, the time of sunrise on any given day at any given site is easily obtainable and not difficult to establish. On July 21, 2020, the sun rose in Rapid City at 5:28:36 a.m. MDT. *July 2020 -*

_____

(. . . continued)

important to note that both sunrise and sunset are 'instants'. The time range during which the day becomes night or vice versa is called twilight. We can distinguish between the morning twilight, that happens between dawn and sunrise and the evening twilight, that happens between sunset and dusk each day. Duration of twilight actually depends on our position on Earth and date of year." *Sunset and Sunrise Times*, SUNRISE SUNSET, sunrise-sunset.org (last visited April 3, 2023). Twilight began at 4:56:03 a.m. MDT in Rapid City, South Dakota on July 21, 2020. *July 2020 - Rapid City, South Dakota - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/us/rapid-city-sd/2020/7 (last visited April 3, 2023). Sunrise occurred 32 minutes and 33 seconds after twilight began in Rapid City, South Dakota on July 21, 2020. *Id.*

10.        *Compare June 2020 - Rapid City, South Dakota - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/us/rapid-city-sd/2020/6 (last visited April 3, 2023) *with December 2020 - Rapid City, South Dakota - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/us/rapid-city-sd/2020/12 (last visited April 3, 2023).

11.        For example, on July 21, 2020, the sun rose in Sioux Falls at 6:04:17 am CDT. *July 2020 - Sioux Falls, Sioux Falls Township, Minnehaha County, South Dakota, USA - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/search?location=sioux%20falls,%20sd&year=2020&month=7#calendar (last visited April 3, 2023). That was 24 minutes and 19 seconds before the sun rose in Rapid City on the same date. *July 2020 - Rapid City, South Dakota - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/us/rapid-city-sd/2020/7 (last visited April 3, 2023).

*Rapid City, South Dakota - Sunrise and sunset calendar*, SUNRISE SUNSET, sunrise-sunset.org/us/rapid-city-sd/2020/7 (last visited April 3, 2023). Even though the State did not present any evidence to establish the time of sunrise, the majority concludes that "the jurors could reasonably infer, without resorting to mere speculation, that at least thirty minutes passed between the time Robertson entered Tucker's garage and when the sun later rose[.]" *Ante*, ¶ 42. This inference is not reasonable because it assumes the jurors knew the time of sunrise based on testimony that twilight began when law enforcement officers were taking pictures of Robertson's escape vehicle that was found "under two miles" from Tucker's residence and "approximately ten minutes after Brad Tucker had found [Robertson] in his front yard." At its core, the majority is concluding that it falls within the common knowledge and experience of jurors to accurately identify the time of sunrise in Rapid City on a morning nine months before the jury trial. I respectfully disagree.

[¶53.] This was simply a failure by the State to prove an essential element of the offense. "The State has the burden of proving each element of an offense beyond a reasonable doubt." *State v. Means*, 363 N.W.2d 565, 568 (S.D. 1985). Requiring the State to prove the time of sunrise does not impose an onerous burden. We should not excuse this failure of proof by allowing the jury to speculate about when the sun rose on the morning of the burglary. For these reasons, I respectfully dissent from the majority opinion on Issue 3.

[¶54.] JENSEN, Chief Justice, joins this writing.